## SCALES v. UNITED STATES.

No. 1.   Argued April 29, 1959.—Reargued October 10, 1960.—
Decided June 5, 1961.

*Telford Taylor* reargued the cause for petitioner. With him on the briefs was *McNeill Smith*.

*John F. Davis* reargued the cause for the United States. With him on the briefs were *Solicitor General Rankin, Assistant Attorney General Yeagley, Kevin T. Maroney* and *Philip R. Monahan*.

*Osmond K. Fraenkel* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

Mr. Justice Harlan delivered the opinion of the Court.

Our writ issued in this case (358 U. S. 917) to review a judgment of the Court of Appeals (260 F. 2d 21) affirming petitioner's conviction under the so-called membership clause of the Smith Act. 18 U. S. C. § 2385. The Act, among other things, makes a felony the acquisition or holding of knowing membership in any organization which advocates the overthrow of the Government of the United States by force or violence.[1] The indictment charged that from January 1946 to the date of its filing (November 18, 1954) the Communist Party of the United States was such an organization, and that petitioner

---

[1] Section 2385 (whose membership clause we place in italics) reads:

"Whoever knowingly or willfully advocates, abets, advises, or teaches the duty, necessity, desirability, or propriety of overthrowing or destroying the government of the United States or the government of any State, Territory, District or Possession thereof, or the government of any political subdivision therein, by force or violence, or by the assassination of any officer of any such government; or

"Whoever, with intent to cause the overthrow or destruction of any such government, prints, publishes, edits, issues, circulates, sells, distributes, or publicly displays any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence, or attempts to do so; or

"Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; *or becomes or is a member of,* or affiliates with, *any such society, group, or assembly of persons, knowing the purposes thereof—*

"Shall be fined not more than $20,000 or imprisoned not more than twenty years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction.

"If two or more persons conspire to commit any offense named in this section, each shall be fined not more than $20,000 or imprisoned not more than twenty years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction."

throughout that period was a member thereof, with knowledge of the Party's illegal purpose and a specific intent to accomplish overthrow "as speedily as circumstances would permit."

The validity of this conviction is challenged on statutory, constitutional, and evidentiary grounds, and further on the basis of certain alleged trial and procedural errors. We decide the issues raised upon the fullest consideration, the case having had an unusually long history in this Court.[2] For reasons given in this opinion we affirm the Court of Appeals.

## I.

### STATUTORY CHALLENGE.

Petitioner contends that the indictment fails to state an offense against the United States. The claim is that § 4 (f) of the Internal Security Act of 1950, 64 Stat. 987,

---

[2] Petitioner was first convicted before a jury in the Middle District of North Carolina in 1955. The conviction was upheld by the Court of Appeals, 227 F. 2d 581, and we granted certiorari at the 1955 Term. 350 U. S. 992. The case was first heard here at the 1956 Term, and was later set for reargument at the 1957 Term. Before reargument the judgment of conviction was reversed, upon the Solicitor General's concession that this Court's intervening decision in *Jencks* v. *United States,* 353 U. S. 657, in any event entitled Scales to a new trial. Scales was retried and again convicted in 1958. The Court of Appeals again affirmed, 260 F. 2d 21, and we again brought the case here. 358 U. S. 917. Argument on the present writ was first heard at the 1958 Term, the case being set for reargument at the following Term under an order in which the Court propounded certain questions to which counsel were requested particularly to address themselves. 360 U. S. 924. Before reargument was had, certiorari was granted (361 U. S. 951) in *Communist Party* v. *Subversive Activities Control Board* (No. 12, decided today, *ante,* p. 1), certain of the statutory and constitutional issues in which were closely related to some of those in the *Scales* case. Because of this interrelation of the two cases, the Court deemed it advisable that they should be heard and considered together, and accordingly put over this case for argument with the *Communist Party* case at the present Term. 361 U. S. 952.

50 U. S. C. § 781 *et seq.,* constitutes a *pro tanto* repeal of the membership clause of the Smith Act by excluding from the reach of that clause membership in any Communist organization. Section 4 (f) provides:

"Neither the holding of office nor membership in any Communist organization by any person shall constitute per se a violation of subsection (a) or subsection (c) of this section or of any other criminal statute. The fact of the registration of any person under section 7 or section 8 of this title as an officer or member of any Communist organization shall not be received in evidence against such person in any prosecution for any alleged violation of subsection (a) or subsection (c) of this section or for any alleged violation of any other criminal statute."

To prevail in his contention petitioner must, of course, bring himself within the first sentence of this provision, since the second sentence manifestly refers only to exclusion from evidence of the fact of registration, thus assuming that a prosecution may take place.

We turn first to the provision itself, and find that, as to petitioner's construction of it, the language is at best ambiguous if not suggestive of a contrary conclusion. Section 4 (f) provides that membership or office-holding in a Communist organization shall not constitute "per se a violation of subsection (a) or subsection (c) of this section or of any other criminal statute." Petitioner would most plainly be correct if the statute under which he was indicted purported to proscribe membership in Communist organizations, as such, and to punish membership *per se* in an organization engaging in proscribed advocacy. But the membership clause of the Smith Act on its face, much less as we construe it in this case, does not do this, for it neither proscribes membership in Communist organizations, as such, but only in organizations engaging in advocacy of violent overthrow, nor punishes membership

208

in that kind of organization except as to one "knowing the purposes thereof," and, as we have interpreted the clause, with a specific intent to further those purposes (*infra,* pp. 219–222). We have also held that the proscribed membership must be active, and not nominal, passive or theoretical (*infra,* pp. 222–224). Thus the words of the first sentence of § 4 (f) by no means unequivocally demand the result for which petitioner argues. When we turn from those words to their context, both in the section as a whole and in the scheme of the Act of which they are a part, whatever ambiguity there may be must be resolved, in our view, against the petitioner's contention.

In the context of § 4 as a whole, the first sentence of subsection (f) does not appear to be a provision repealing in whole or in part any other provision of the Internal Security Act. Subsection (a) of § 4 makes it a crime

> "for any person knowingly to combine, conspire, or agree with any other person to perform any act which would substantially contribute to the establishment within the United States of a totalitarian dictatorship . . . the direction and control of which is to be vested in, or exercised by or under the domination or control of, any foreign government, foreign organization or foreign individual . . . ."

Subsection (c) makes it a crime for any officer or member of a "Communist organization" to obtain classified information. We should hesitate long before holding that subsection (f) operates to repeal *pro tanto* either one of these provisions which are found in the same section of which subsection (f) is a part; and indeed the petitioner does not argue for any such quixotic result. The natural tendency of the first sentence of subsection (f) as to the criminal provisions specifically mentioned is to provide clarification of the meaning of those provisions, that is, that an offense is not made out on proof of *mere* member-

ship in a Communist organization. As to these particularly mentioned criminal provisions immunity, such as there is, is specifically granted in the second sentence only, where it is said that the fact of registration shall not be admitted in evidence. Yet petitioner argues that when we come to the last phrase of the first sentence, the tag "or . . . any other criminal statute," the operative part of the sentence, "membership . . . shall [not] constitute per se a violation," has an altogether different purport and effect. What operated as a clarification and guide to construction to the specifically identified provisions is, petitioner argues, a partial repealer as to the statutes referred to in the omnibus clause at the end of the sentence.

It seems apparent from the foregoing that the language of § 4 (f) in its natural import and context should not be taken to immunize members of Communist organizations from the membership clause of the Smith Act, but rather as a mandate to the courts charged with the construction of subsections (a) and (c) "or . . . any other criminal statute" that neither those two named criminal provisions nor any other shall be *construed* so as to make "membership" in a Communist organization "per se a violation." Indeed, as we read the first sentence of § 4 (f), even if the membership clause of the Smith Act could be taken as punishing naked Communist Party membership, it would then be our duty under § 4 (f) to construe it in accordance with that mandate, certainly not to strike it down. Although we think that the membership clause on its face goes beyond making mere Party membership a violation, in that it requires a showing both of illegal Party purposes and of a member's knowledge of such purposes, we regard the first sentence of § 4 (f) as a clear warrant for construing the clause as requiring not only knowing membership, but active and purposive membership, purposive that is as to the organization's criminal ends. (*Infra,* pp. 219–224.) By its terms, then, subsection (f) does not

effect a *pro tanto* repeal of the membership clause; at most it modifies it.

Petitioner argues that if the § 4 (f) provision does not bar this prosecution under the membership clause, then the phrase "or of any other criminal statute" becomes meaningless, for there is no other federal criminal statute that makes this sort of membership a crime. But the argument assumes the answer. The first sentence was intended to clarify, not repeal, § 4 (a) of the Internal Security Act. By a parity of reasoning, its effect on "any other criminal statute" is also clarification, not repeal.

Petitioner's contentions do not stop, however, with the words of § 4 (f) itself. The supposed partial repeal of the membership clause by that provision, it is claimed, is a consequence of the latter's purpose in the whole scheme of the Internal Security Act of 1950, as illuminated by its legislative history. The argument runs as follows: The core of the Internal Security Act is its registration provisions (§§ 7 and 8), requiring disclosure of membership in the Communist Party following a valid final determination of the Subversive Activities Control Board as to the status of the Party. See No. 12, *ante,* p. 1. The registration requirement would be rendered nugatory by a plea of self-incrimination and could only be saved by a valid grant of immunity from prosecution by reason of any such disclosure. However, the immunity provided by the second sentence of § 4 (f) is insufficient, in that it forbids only the use of the "fact of . . . registration" as evidence in any future prosecution, and not also its employment as a "lead" to other evidence. See *Counselman* v. *Hitchcock,* 142 U. S. 547; *Blau* v. *United States,* 340 U. S. 332. Therefore to effectuate the congressional purpose it becomes necessary to consider the first sentence of § 4 (f) a *pro tanto* repealer of the membership clause of the Smith Act, thereby assuring effective immunity from the criminal consequences of registration in this instance.

Although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute. Certainly the section before us cannot be construed as petitioner argues. The fact of registration may provide a significant investigatory lead not only in prosecutions under the membership clause of the Smith Act, but equally probably to prosecutions under § 4 (a) of the Internal Security Act, let alone § 4 (c). Thus, if we accepted petitioner's argument that § 4 (f) must be read as a partial repealer of the membership clause, we would be led to the extraordinary conclusion that Congress also intended to immunize under § 4 (f) what it prohibited in these other subsections which it passed at the same time. Furthermore, the thrust of petitioner's argument cannot be limited to the membership clause, for it is equally applicable to any prosecution under any of a host of criminal provisions where Communist Party membership might provide an investigatory lead as to the elements of the crime.[3] We cannot attribute any such sweeping purpose to Congress on the basis of the attenuated inference offered by petitioner.

Presented as we are with every indication in the statute itself that Congress had no purpose to bar a prosecution such as this, we turn to the legislative history of the Internal Security Act of 1950 to see if a different conclusion is indicated.

Section 4 (f) is the product of the fusion of provisions contained in measures conceived by the House and the Senate to deal with the problem which is the subject of

---

[3] E. g., 18 U. S. C. § 2385 (the remaining provisions of the Smith Act); 29 U. S. C. § 159 (h), repealed by the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, § 201 (d) (non-Communist affidavits to be filed by union officers); or any of the offenses created by the Internal Security Act of 1950, for instance under §§ 4, 5 or 6.

the present Internal Security Act. Primarily, however, § 4 is the result of the Senate's efforts. In 1949 Senator Mundt reintroduced in the Senate a bill, the Mundt-Nixon bill, which had died in committee the year before. S. 2311, 81st Cong., 1st Sess. The bill, which was referred to the Committee on the Judiciary, contained registration provisions similar to those in the present statute, and a § 4 (a), a criminal provision identical to that of the present § 4 (a). In response to an enquiry, the Committee received a letter from an eminent lawyer, the late John W. Davis of New York, to the effect that although the primary purpose of the bill appears to be "ventilation rather than prohibition," there was a question whether *"mere membership* in a Communist political organization, which is . . . required to register [might] constitute an act such as section 4 (a) proscribes? If so," the letter continued, "is there not inherent contradiction between these sections, and might not a person called on to register as a member claim that he would involuntarily incriminate himself by so doing?" (Emphasis supplied.) S. Rep. No. 1358, 81st Cong., 1st Sess., pp. 43–44. Thus, the Davis letter seemed to address itself only to self-incrimination under the proscriptions of § 4 (a), and only to the extent that the membership disclosed by registration would without more constitute a violation of § 4 (a).

In response to this narrow objection the Committee drafted the predecessor of the present § 4 (f). That section, also numbered § 4 (f), provided that:

"Neither the holding of office nor membership in any Communist organization by any person shall constitute a violation of subsection (a) . . . of this section. The fact of the registration of any person . . . shall not be received in evidence against such person in any prosecution for any alleged violation of subsection (a) . . . ." S. 2311, as amended.

The Committee in reporting the bill out to the Senate made it abundantly clear that whatever objections might be made could, in its view, be overcome by the clarification of § 4 (a) contained in § 4 (f), to wit: that *"mere membership in an organization required to register is not an overt act such as to bring a person within the prohibitions of section 4. This amendment was inserted to make clear the intent of Congress that registration . . . was not evidence of a violation of section 4 of the bill."* [4] (Emphasis supplied.) S. Rep. No. 1358, *supra,* p. 2. To the drafters of the original version of the section, then, the perforce limited immunity of the second sentence of § 4 (f) together with the clarification of the meaning of § 4 (a) in the first sentence was adequate to deal with the self-incrimination problem under § 4 (a), raised by the Davis letter. There is no mention of the Smith Act or any other criminal statute as yet, but the problem of the necessary scope of immunity is no different in relation to § 4 (a) than it would be to such other statutes.

The subsequent history of the section in the Senate reinforces the conclusion that there was no intent to grant a broad immunity such as would meet the reasoning of *Counselman* v. *Hitchcock.* The Mundt-Nixon bill was incorporated in the body of an omnibus measure, the McCarran bill. S. 4037, 81st Cong., 2d Sess. When this bill was reported out to the Senate no further mention was made in the majority report of the Judiciary

---

[4] The report also stated: "Nowhere does the bill restrict or impair the constitutional privilege against self-incrimination under the fifth amendment. . . . As to whether any registration itself infringes upon the privilege of self-incrimination, . . . [w]ith respect to individual members, a person may be compelled to register, keep records, make reports or statements, etc., concerning any activity which the State properly may regulate, and he is not protected therefrom by the privilege . . . . This becomes purely academic, however, in the light of the specific bar to self-incrimination written into section 4 (f)." *Id.,* at pp. 20–21.

Committee of the sections under consideration. However, Senator Kilgore's minority report squarely presented two questions as to the insufficiency of the immunity provisions of § 4 (f): (1) that the immunity was inadequate to meet the *Counselman* rule, and (2) that in any case there was no immunity of any sort granted in respect of the Smith Act. S. Rep. No. 2369, 81st Cong., 2d Sess., Pt. 2, pp. 12–13. These grounds were urged against the bill also in debate by its opponents. Senator Humphrey read into the Record a "brief" prepared by the Justice Department which in effect restated the objections of the minority report. 96 Cong. Rec. 14475, at 14479. Senator Lehman stated the same objections, and also suggested that the membership clause of the Smith Act as well as § 4 (a) made Communist membership *per se* a crime. This latter contention was vigorously denied by the proponents of the measure.[5] Thus, the Senate passed

---

[5] Senator Lehman, arguing that the bill required self-incrimination, stated:

"We already have on the statute books more than 20 laws to control and penalize subversive activities. . . . We also have the Smith Act, recently upheld by the Court of Appeals, which makes membership in the Communist Party prima facie evidence of criminal intent. . . .

". . . [R]egistration would constitute self-incrimination, if not under the terms of this law, then under the terms of the Smith Act." 96 Cong. Rec. 14190.

As the debate continued, Senator Long said:

"I was under the impression from hearing the Senator from New York yesterday, that he said that under a previous statute it was unlawful to belong to an organization that advocated the overthrow of the United States government by force . . . that there was a previous act . . . which made it unlawful for one to be a member of [such] an organization . . . .

.        .        .        .        .

"Senator Ferguson. Is it not true that Judge Medina, in his charge to the jury in the trial of the 11 Communists, told them that mere membership in the Communist Party was not sufficient to warrant the jury in convicting them under the Smith Act? [The petitioner in the present case correctly notes that this reference was to the

its predecessor version of § 4 (f), even though it had had clearly presented to it constitutional objections to that provision which are the same as the objections petitioner now makes to a natural and literal reading of the present statute. There was no immunity of any kind against Smith Act prosecutions, and only limited immunity against prosecutions under the comparable provisions of § 4 (a).

The history of the original House measure is likewise relevant to the issue under consideration. That measure,

---

*Dennis* case involving an indictment for conspiracy to advocate, not the membership clause of the Smith Act.]

"Mr. Mundt [who was one of the proponents of the original bill]. Precisely.

"Mr. Ferguson. So that it could not apply to that law.

"Mr. Mundt. It could not conceivably apply. . . . [I]t would still be an incorrect interpretation of the [Smith] Act. . . ." 96 Cong. Rec. 14235.

Senator McCarran, whose name the new omnibus Senate measure bore, stated in connection with the Smith Act:

"It was arresting to hear the Senator from New York declare on Tuesday that—'[t]he Smith Act . . . makes membership in the Communist Party prima facie evidence of criminal intent.'

". . . [O]f course, the statement about the Smith Act making membership in the Communist Party prima facie evidence of criminal intent simply has no foundation in fact.

". . . Of course, in order to make a statement like the one he made a man must not have read Judge Medina's scholarly charge to the jury, in which he specifically pointed out that the Communist membership or affiliation of the 11 defendants was not . . . a part of the charged offense . . . .

. . . . .

"Mr. President, subsection 4 (f) provides as follows: 'neither the holding of office nor membership . . . shall constitute a violation of subsection (a) . . . .'

". . . I hope the Senator from New York may find time to read [the section as a whole], and then I hope he may see fit to tell the Senate whether he still thinks Communists, *as such*, would obviously be indictable and subject to imprisonment under section 4 (a)." 96 Cong. Rec. 14442–14443. (Emphasis supplied.)

the Wood bill, which also provided for registration, contained no provision similar to § 4 (a), but did have a provision similar to the present § 4 (c), forbidding members of Communist organizations from obtaining classified information.   H. R. 9490, 81st Cong., 2d Sess.   The bill included an immunity provision in the same subsection as the predecessor to present § 4 (c), which declared that:

> ". . . the fact of the registration of any person . . . shall not be received in evidence against such person in any prosecution for any alleged violation . . . of this section."

Once again, the Wood bill demonstrates the same narrow view of the self-incrimination problem as was evidenced by the Senate bill.   In debate Congressmen Celler and Marcantonio, opposing the bill, pointed to the twofold inadequacy of the immunity provision: its failure to meet *Counselman,* and its not reaching other criminal statutes. 96 Cong. Rec. 13739–13740.   The House responded to these objections by adding the words "or for any alleged violation of any other . . . criminal statute" at the end of the above-quoted provision.   96 Cong. Rec. 13761. It is, therefore, even clearer than in the case of the Senate's action that there was no attempt to grant complete immunity or to repeal any other statute at least as to prosecution of Communist Party members, since the House's immunity provision in terms only dealt with the admission into evidence of the fact of registration, having no provision comparable to the first sentence of present § 4 (f).   That there was no such provision may perhaps be explained by the fact that there was no equivalent to § 4 (a) in need of clarification.

In conference, the substance of the Senate bill was accepted by the conferees, including the criminal provision of the present § 4 (a).   The Senate version of § 4 (f) was amended to its present form by the addition of the

House "or any other criminal statute" language to both the first and second sentences of the subsection, and by the addition of "per se" to the first sentence. Thus we are asked by petitioner to hold that although neither House in its preconference bills evidenced any purpose to repeal the Smith Act insofar as Communist Party membership was concerned, let alone other possibly applicable statutes under which registration as a Party member might produce an investigatory lead (see note 3, *supra*), the amalgamation of these two bills was intended, though without any notification by the conferees to either House in their conference reports, to have this result. Nor does the addition of the words "per se" advance petitioner's argument. On its face the addition would seem simply to make more explicit the clarifying purpose of the sentence. In its context of worries that § 4 (a) or the Smith Act makes Communist membership *per se* criminal, and of statements by the proponents of the bills that this was an unfounded fear as to both provisions, the purely clarifying purpose of *per se* is apparent. Furthermore, we are asked to attribute this purpose to the conferees, although neither they nor the proponents of the measure as it finally emerged from conference said a word about such an important departure from the original purposes of the two Houses.[6]

---

[6] Perhaps the closest we come to any suggestion that § 4 (f) repeals, *pro tanto*, the Smith Act is the statement by Representative Multer of New York, an opponent of the measure, during the debate on the final version of the bill: "Another very bad provision in this bill is the new—to this House—first sentence [of § 4 (f)] . . . .

"I venture to predict that if this bill becomes law you not only vitiate one of the most important parts of the Smith law, but you will give a new argument and defense to the 11 Communists recently convicted in the Federal court in New York of crimes against the United States, as proscribed in the Smith law," 96 Cong. Rec. 15289, or a similar argument against the bill by Senator Kilgore, 96 Cong. Rec. 15192.

Finally, it is worth noting that after the conference measure returned to the floor of the Senate it was attacked by Senator Kefauver on precisely the same grounds as had been urged against it in both Houses prior to conference: that the immunity conferred by the present § 4 (f) was too narrowly drawn to save the registration provisions against an attack under *Counselman.* 96 Cong. Rec. 15198–15199. This same attack was renewed after the President's veto, which was overridden by Congress.[7] 96 Cong. Rec. 15553–15554.

---

[7] Petitioner makes reference to the legislative history of an amendment to the Communist Control Act of 1954, S. 3706, 83d Cong., 2d Sess., introduced and passed with modifications in a hurried and confused debate in both Houses. The amendment, proposed by Senator Humphrey, provided that it would be criminal knowingly and wilfully to become or remain a member of the Communist Party, or any other organization whose purpose is to overthrow the government by force and violence. The amendment was opposed by the proponents of the Internal Security Act of 1950, among others, on the grounds that it would impair the effectiveness of § 4 (f) of the 1950 Act, possibly rendering the registration provisions of that Act unconstitutional. But it seems clear that this result was conceived to flow from the fact that the amendment mentioned the Communist Party by name, thus making registration tantamount to an admission of the crime itself. As Representative Halleck, the then majority leader who opposed the amendment, put it:

". . . [W]e have the Internal Security Act of 1950, which was worked out after the most careful consideration . . . and the Smith Act, under which we have had more than 100 indictments and sixty-some convictions, all of Communist leaders . . . . Those acts we have on the books . . . they have established themselves.

". . . [T]he Attorney-General . . . [s]peaking of the Internal Security Act . . . said: 'Essential to the validity of this careful plan, however, is the provision of section 4 (f) of the act . . . . It is apparent that the enactment of legislation making membership in the Communist Party per se a crime would be in direct conflict with these provisions of the Internal Security Act. If membership alone is made criminal, to require him to declare his membership is to require him to give

The legislative history of § 4 (f), therefore, far from weakening the conclusion flowing from analysis of the terms of the statute itself, fortifies that analysis at every point. To conclude that Congress' desire to protect the registration provisions of the Internal Security Act against pleas of self-incrimination should prevail over its advertent failure to assure that result at the expense of wiping out the membership clause of the Smith Act, as applied to Communists, would require a disregard by this Court of the evident congressional purpose. Whatever may be the consequences of that failure upon the Internal Security Act, we are concerned here solely with the question whether Congress by § 4 (f) intended a partial repeal of the membership clause of the Smith Act. We conclude that it did not and hold that this prosecution is not barred by § 4 (f) of the Internal Security Act of 1950.

## II.

### Constitutional Challenge to the Membership Clause on its Face.

Petitioner's constitutional attack goes both to the statute on its face and as applied. At this point we deal with the first aspect of the challenge and with one part

---

self-incriminating evidence. By nullifying this portion of the act, its entire operation would be jeopardized . . . .'

"In other words, what we are doing permits outlawing the Communist Party, and maintaining the Internal Security Act, the Smith Act, and all other acts by which we deal realistically with the Communist conspiracy." 100 Cong. Rec. 14658.

There is no doubt that the Humphrey amendment is in many respects similar to the membership clause. But it was assumed by many of the proponents of the 1950 Act, perhaps illogically and under a misapprehension as to the law, that the amendment should be defeated to preserve the integrity of the 1950 Act and the Smith Act. Certainly it was considered by no one that the membership clause had been repealed, or its application to Communists barred by § 4 (f) of the 1950 Act.

of its second aspect. The balance of the latter, which essentially concerns the sufficiency of the evidence, is discussed in the next section of this opinion.

It will bring the constitutional issues into clearer focus to notice first the premises on which the case was submitted to the jury. The jury was instructed that in order to convict it must find that within the three-year limitations period [8] (1) the Communist Party advocated the violent overthrow of the Government, in the sense of present "advocacy of action" to accomplish that end as soon as circumstances were propitious; and (2) petitioner was an "active" member of the Party, and not merely "a nominal, passive, inactive or purely technical" member, with knowledge of the Party's illegal advocacy and a specific intent to bring about violent overthrow "as speedily as circumstances would permit."

The constitutional attack upon the membership clause, as thus construed, is that the statute offends (1) the Fifth Amendment, [9] in that it impermissibly imputes guilt to an individual merely on the basis of his associations and sympathies, rather than because of some concrete personal involvement in criminal conduct; and (2) the First Amendment, [10] in that it infringes on free political expression and association. Subsidiarily, it is argued that the statute cannot be interpreted as including a requirement of a specific intent to accomplish violent overthrow, or as requiring that membership in a proscribed organization must be "active" membership, in the absence of both or either of which it is said the statute becomes *a fortiori* unconstitu-

---

[8] November 18, 1951, to November 18, 1954. See 18 U. S. C. § 3282.

[9] "No person shall . . . be deprived of life, liberty or property, without due process of law . . . ."

[10] "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

tional.[11]  It is further contended that even if the adjective "active" may properly be implied as a qualification upon the term "member," petitioner's conviction would nonetheless be unconstitutional, because so construed the statute would be impermissibly vague under the Fifth and Sixth Amendments,[12] and so applied would in any event infringe the Sixth Amendment, in that the indictment charged only that Scales was a "member," not an "active" member, of the Communist Party.

### 1. *Statutory Construction.*

Before reaching petitioner's constitutional claims, we should first ascertain whether the membership clause permissibly bears the construction put upon it below.  We think it does.

The trial court's definition of the kind of organizational advocacy that is proscribed was fully in accord with what was held in *Yates* v. *United States,* 354 U. S. 298.[13]  And the statute itself requires that a defendant must have knowledge of the organization's illegal advocacy.

The only two elements of the crime, as defined below, about which there is controversy are therefore "specific intent" and "active" membership.  As to the former, this Court held in *Dennis* v. *United States,* 341 U. S. 494, 499–500, that even though the "advocacy" and "organizing" provisions of the Smith Act, unlike the "literature" section (note 1, *supra*), did not expressly contain such a specific intent element, such a requirement was fairly to be implied.  We think that the reasoning of *Dennis*

---

[11] While the Government undertakes to defend the statute in the absence of either or both of such elements, its ultimate constitutional position rests on the presence of both.

[12] "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."

[13] See note 27, *infra.*

applies equally to the membership clause, and are left unpersuaded by the distinctions petitioner seeks to draw between this clause and the advocacy and organizing provisions of the Smith Act.

We find hardly greater difficulty in interpreting the membership clause to reach only "active" members. We decline to attribute to Congress a purpose to punish nominal membership, even though accompanied by "knowledge" and "intent," not merely because of the close constitutional questions that such a purpose would raise (cf. *infra*, p. 228; *Yates, supra,* at 319), but also for two other reasons: It is not to be lightly inferred that Congress intended to visit upon mere passive members the heavy penalties imposed by the Smith Act.[14] Nor can we assume that it was Congress' purpose to allow the quality of the punishable membership to be measured solely by the varying standards of that relationship as subjectively viewed by different organizations. It is more reasonable to believe that Congress contemplated an objective standard fixed by the law itself, thereby assuring an evenhanded application of the statute.

This Court in passing on a similar provision requiring the deportation of aliens who have become members of the Communist Party—a provision which rested on Congress' far more plenary power over aliens, and hence did not press nearly so closely on the limits of constitutionality as this enactment—had no difficulty in interpreting "membership" there as meaning more than the mere voluntary listing of a person's name on Party rolls. *Galvan* v. *Press,* 347 U. S. 522; *Rowoldt* v. *Perfetto,* 355 U. S. 115;

---

[14] The statute allows a fine of not more than $10,000 and imprisonment for not more than ten years to be imposed, and makes one convicted under the statute ineligible for employment by the United States or any department or agency thereof for five years following conviction. Petitioner was sentenced to imprisonment for six years.

see *Bridges* v. *Wixon,* 326 U. S. 135.   A similar construction is called for here.[15]

Petitioner's particular constitutional objections to this construction are misconceived.   The indictment was not defective in failing to charge that Scales was an "active" member of the Party, for that factor was not in itself a discrete element of the crime, but an inherent quality of the membership element.   As such it was a matter not for the indictment, but for elucidating instructions to the jury on what the term "member" in the statute meant.   Nor do we think that the objection on the score of vagueness is a tenable one.   The distinction between "active" and "nominal" membership is well understood in common parlance (cf. *Boyce Motor Lines* v. *United States,* 342 U. S. 337; *United States* v. *Petrillo,* 332 U. S. 1; *Sproles* v. *Binford,* 286 U. S. 374), and the point at which one shades into the other is something that goes not to the sufficiency of the statute, but to the adequacy of the trial court's guidance to the jury by way of instructions in a particular case.   See note 29, *infra.*   Moreover, whatever abstract doubts might exist on the matter, this case presents no such problem.   For petitioner's actions on behalf of the Communist Party most certainly amounted to active membership by whatever standards one could reasonably anticipate, and he can therefore hardly be considered to have acted unadvisedly on this score.

We find no substance in the further suggestion that petitioner could not be expected to anticipate a construction of the statute that included within its elements activity and specific intent, and hence that he was not

---

[15] The element of "activity" in the proscribed membership stands apart from the ingredient of guilty "knowledge" in that the former may be shown by a defendant's participation in general Party affairs, whereas the latter requires linking him with the organization's illegal activities.

duly warned of what the statute made criminal. It is, of
course, clear that the lower courts' construction was nar-
rower, not broader, than the one for which petitioner
argues in defining the character of the forbidden conduct
and that therefore, according to petitioner's own con-
struction, his actions were forbidden by the statute. The
contention must then be that petitioner had a right to
rely on the statute's, as *he* construed it, being held uncon-
stitutional. Assuming, *arguendo*, that petitioner's con-
struction was not unreasonable, no more can be said
than that—in light of the courts' traditional avoidance
of constructions of dubious constitutionality and in light
of their role in construing the purpose of a statute—there
were two ways one could reasonably anticipate this stat-
ute's being construed, and that petitioner had clear warn-
ing that his actions were in violation of both constructions.
There is no additional constitutional requirement that
petitioner should be entitled to rely upon the statute's
being construed in such a way as possibly to render it
unconstitutional. In sum, this argument of a "right" to
a literal construction simply boils down to a claim that
the view of the statute taken below did violence to the
congressional purpose. Of course a litigant is always
prejudiced when a court errs, but whether or not the lower
courts erred in their construction is an issue which can
only be met on its merits, and not by reference to a "right"
to a particular interpretation.

We hold that the statute was correctly interpreted by
the two lower courts, and now turn to petitioner's basic
constitutional challenge.

## 2. *Fifth Amendment.*

In our jurisprudence guilt is personal, and when the
imposition of punishment on a status or on conduct can
only be justified by reference to the relationship of that

status or conduct to other concededly criminal activity (here advocacy of violent overthrow), that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment. Membership, without more, in an organization engaged in illegal advocacy, it is now said, has not heretofore been recognized by this Court to be such a relationship.[16] This claim stands, and we shall examine it, independently of the claim made under the First Amendment.

Any thought that due process puts beyond the reach of the criminal law all individual associational relationships, unless accompanied by the commission of specific acts of criminality, is dispelled by familiar concepts of the law of conspiracy and complicity. While both are commonplace in the landscape of the criminal law, they are not natural features. Rather they are particular legal concepts manifesting the more general principle that society, having the power to punish dangerous behavior, cannot be powerless against those who work to bring about that behavior.[17]

---

[16] But compare *Whitney* v. *California*, 274 U. S. 357; *Burns* v. *United States*, 274 U. S. 328, sustaining state convictions under the organizing and membership provisions of the California Criminal Syndicalism Act.

[17] Complicity has been defined thus: "A person is an accomplice of another person in commission of a crime if:

"(a) with the purpose of promoting or facilitating the commission of the crime, he

"(1) commanded, requested, encouraged or provoked such other person to commit it; or

"(2) aided, agreed to aid or attempted to aid such other person in planning or committing it . . .

. . . . .

"(b) acting with knowledge that such other person was committing or had the purpose of committing the crime, he knowingly, substantially facilitated its commission . . . ." American Law Institute, Model Penal Code § 2.04 (3), tentative draft No. 1 (1953). The formulation restates the statutory provisions generally found in juris-

The fact that Congress has not resorted to either of these familiar concepts means only that the enquiry here must direct itself to an analysis of the relationship between the fact of membership and the underlying substantive illegal conduct, in order to determine whether that relationship is indeed too tenuous to permit its use as the basis of criminal liability. In this instance it is an organization which engages in criminal activity,[18] and we can

dictions in the United States. See, *e. g.*, 18 U. S. C. § 2 (a); Ariz. Code Ann., 1939, § 43–116; Vernon's Texas Stat., 1952, Pen. Code, Art. 70; cf. Criminal Code of Canada, Tremeear's, 1944, § 69. It should be noted that the membership clause as here construed is more limited than subsection (b) of this provision, since it is not enough that one has knowingly facilitated the substantive criminal conduct, but there must also be present the specific purpose of facilitating it.

There is, of course, considerable overlap between the law of complicity and the law of conspiracy, and genuine problems arise as to whether a conspirator is, by reason of his conspiracy, to be considered an accomplice and therefore guilty also of the substantive offense. See ALI, Model Penal Code, tentative draft No. 1 (1953), at pp. 20–33; Developments in the Law—Criminal Conspiracy, 72 Harv. L. Rev. 922, 993–1000 (1959). But we are solely concerned here with pointing up the accepted limits of imputation of guilt, not with exploring the problems created by the various provisions by which such imputation is effected.

[18] The problems in attributing criminal behavior to an abstract entity rather than to specified individuals, though perhaps difficult theoretically, as a practical matter resolve themselves into problems of proof. Whether it has been successfully shown that a particular group engages in forbidden advocacy must depend on the nature of the organization, the occasions on which such advocacy took place, the frequency of such occasions, and the position within the group of the persons engaging in the advocacy. (See pp. 253–254, *infra*.) Understood in this way, there is no great difference between a charge of being a member in a group which engages in criminal conduct and being a member of a large conspiracy, many of whose participants are unknown or not before the court. Whatever difficulties might be thought to inhere in ascribing a course of criminal conduct to an abstract entity are certainly cured, so far as any particular defendant

perceive no reason why one who actively and knowingly works in the ranks of that organization, intending to contribute to the success of those specifically illegal activities, should be any more immune from prosecution than he to whom the organization has assigned the task of carrying out the substantive criminal act. Nor should the fact that Congress has focussed here on "membership," the characteristic relationship between an individual and the type of conspiratorial quasi-political associations with the criminal aspect of whose activities Congress was concerned, of itself require the conclusion that the legislature has traveled outside the familiar and permissible bounds of criminal imputability. In truth, the specificity of the proscribed relationship is not necessarily a vice; it provides instruction and warning.[19]

What must be met, then, is the argument that membership, even when accompanied by the elements of knowledge and specific intent, affords an insufficient quantum of participation in the organization's alleged criminal activity, that is, an insufficiently significant form of aid and encouragement to permit the imposition of criminal sanctions on that basis. It must indeed be recognized that a person who merely becomes a member of an illegal organization, by that "act" alone need be doing nothing more than signifying his assent to its purposes and activities on one hand, and providing, on the other, only the sort of moral encouragement which comes from the knowledge that others believe in what the organization is doing. It may indeed be argued that such assent and encouragement do fall short of the concrete, practical impetus given to a criminal enterprise which is lent for instance by a

is concerned, by the requirement of proof that he knew that the *organization* engages in criminal advocacy, and that it was his purpose to further that criminal advocacy.

[19] See generally Hart, The Aims of the Criminal Law, 23 Law & Contemp. Prob. 401 (1958).

commitment on the part of a conspirator to act in further-
ance of that enterprise. A member, as distinguished from
a conspirator, may indicate his approval of a criminal
enterprise by the very fact of his membership without
thereby necessarily committing himself to further it by
any act or course of conduct whatever.

In an area of the criminal law which this Court has
indicated more than once demands its watchful scrutiny
(see *Dennis, supra,* at 516; *Yates, supra,* at 328; and
see also *Noto* v. *United States,* decided today, *post,*
p. 290), these factors have weight [20] and must be found to
be overborne in a total constitutional assessment of the
statute. We think, however, they are duly met when
the statute is found to reach only "active" members hav-
ing also a guilty knowledge and intent, and which there-
fore prevents a conviction on what otherwise might
be regarded as merely an expression of sympathy with
the alleged criminal enterprise, unaccompanied by any
significant action in its support or any commitment to
undertake such action.

Thus, given the construction of the membership clause
already discussed, we think the factors called for in ren-
dering members criminally responsible for the illegal
advocacy of the organization fall within established, and
therefore presumably constitutional, standards of criminal
imputability.

### 3. *First Amendment.*

Little remains to be said concerning the claim that the
statute infringes First Amendment freedoms. It was
settled in *Dennis* that the advocacy with which we are
here concerned is not constitutionally protected speech,
and it was further established that a combination to pro-

[20] Compare concurring opinion of Mr. Justice Brandeis in *Whitney*
v. *California,* 274 U. S. 357, 372, 373.

mote such advocacy, albeit under the aegis of what purports to be a political party, is not such association as is protected by the First Amendment. We can discern no reason why membership, when it constitutes a purposeful form of complicity in a group engaging in this same forbidden advocacy, should receive any greater degree of protection from the guarantees of that Amendment.

If it is said that the mere existence of such an enactment tends to inhibit the exercise of constitutionally protected rights, in that it engenders an unhealthy fear that one may find himself unwittingly embroiled in criminal liability, the answer surely is that the statute provides that a defendant must be proven to have knowledge of the proscribed advocacy before he may be convicted. It is, of course, true that quasi-political parties or other groups that may embrace both legal and illegal aims differ from a technical conspiracy, which is defined by its criminal purpose, so that *all* knowing association with the conspiracy is a proper subject for criminal proscription as far as First Amendment liberties are concerned. If there were a similar blanket prohibition of association with a group having both legal and illegal aims, there would indeed be a real danger that legitimate political expression or association would be impaired, but the membership clause, as here construed, does not cut deeper into the freedom of association than is necessary to deal with "the substantive evils that Congress has a right to prevent." *Schenck* v. *United States,* 249 U. S. 47, 52. The clause does not make criminal all association with an organization which has been shown to engage in illegal advocacy. There must be clear proof that a defendant "specifically intend[s] to accomplish [the aims of the organization] by resort to violence." *Noto* v. *United States, post,* at p. 299. Thus the member for whom the organization is a vehicle for the advancement of legitimate aims and policies does not fall within the ban of the statute: he

lacks the requisite specific intent "to bring about the overthrow of the government as speedily as circumstances would permit." Such a person may be foolish, deluded, or perhaps merely optimistic, but he is not by this statute made a criminal.

We conclude that petitioner's constitutional challenge must be overruled.[21]

### III.

#### EVIDENTIARY CHALLENGE.

Only in rare instances will this Court review the general sufficiency of the evidence to support a criminal conviction, for ordinarily that is a function which properly belongs to and ends with the Court of Appeals. We do so in this case and in No. 9, *Noto* v. *United States, post,* p. 290—our first review of convictions under the membership clause of the Smith Act—not only to make sure that substantive constitutional standards have not been thwarted, but also to provide guidance for the future to the lower courts in an area which borders so closely upon constitutionally protected rights.

On this phase of the case petitioner's principal contention is that the evidence was insufficient to establish that the Communist Party was engaged in present advocacy of violent overthrow of the Government in the sense required by the Smith Act, that is, in "advocacy of action" for the accomplishment of such overthrow either immediately or as soon as circumstances proved propitious, and uttered in terms reasonably calculated to "incite" to such action. See *Yates* v. *United States, supra,* 318–322. This contention rests largely on the proposition that the

---

[21] As both sides appear to agree that the "clear and present danger" doctrine, as viewed and applied in *Dennis, supra,* at 508–511, also reaches the membership clause of the Smith Act, and since the petition for certiorari tenders no issue as to the method of applying it here, we do not consider either question.

evidence on this aspect of the case does not differ materially from that which the Court in *Yates* stated was inadequate to establish that sort of Party advocacy there.

In *Yates* the Government sought to use the Communist Party, or at least the California branch of the Party, as the conspiratorial nexus between various individuals charged, among other things, with a conspiracy to engage in illegal advocacy. Upon reversal here for error in the trial court's charge on the nature of the advocacy proscribed by the Smith Act, this Court, in the exercise of its powers under 28 U. S. C. § 2106,[22] went on to consider the adequacy of the evidence for the purpose of determining as to which defendants an acquittal should be ordered, and as to which ones the way for a new trial should be left open. In the process it was stated that the Government's Party-conspiratorial-nexus theory was unavailing because the evidence fell short of establishing that the Party's advocacy constituted "a call to forcible action" for the accomplishment of immediate or future overthrow, in contrast to the teaching of mere "abstract doctrine" favoring that end. 354 U. S., at 329. At the same time, however, it was found that the record reflected certain episodes which, it was considered, might permissibly lend themselves to an inference of illegal advocacy by particular Party members (see *id.*, at 331–333). It was concluded, however, that these and similar episodes were too "sporadic" and remote (*id.*, 330) to justify their attribution to the Party, possibly casting its abstract teaching of the "Communist classics" in a different mold. Accordingly, the Court directed an acquittal of those defendants who had not themselves been connected with such episodes.

---

[22] That statute gives the Court power upon review to "direct the entry of such appropriate judgment . . . as may be just under the circumstances."

We agree with petitioner that the evidentiary question here is controlled in large part by *Yates*. The decision in *Yates* rested on the view (not articulated in the opinion, though perhaps it should have been) that the Smith Act offenses, involving as they do subtler elements than are present in most other crimes, call for strict standards in assessing the adequacy of the proof needed to make out a case of illegal advocacy. This premise is as applicable to prosecutions under the membership clause of the Smith Act as it is to conspiracy prosecutions under that statute as we had in *Yates*.

The impact of *Yates* with respect to this petitioner's evidentiary challenge is not limited, however, to that decision's requirement of strict standards of proof. *Yates* also articulates general criteria for the evaluation of evidence in determining whether this requirement is met. The *Yates* opinion, through its characterizations of large portions of the evidence which were either described in detail or referred to by reference to the record, indicates what type of evidence is needed to permit a jury to find that (a) there was "advocacy of action" and (b) the Party was responsible for such advocacy.

First, *Yates* makes clear what type of evidence is not *in itself* sufficient to show illegal advocacy. This category includes evidence of the following: the teaching of Marxism-Leninism and the connected use of Marxist "classics" as textbooks; the official general resolutions and pronouncements of the Party at past conventions; dissemination of the Party's general literature, including the standard outlines on Marxism; the Party's history and organizational structure; the secrecy of meetings and the clandestine nature of the Party generally; statements by officials evidencing sympathy for and alliance with the U. S. S. R. It was the predominance of evidence of this type which led the Court to order the acquittal of several *Yates* defendants, with the comment that they had

not themselves "made a single remark or been present when someone else made a remark which would tend to prove the charges against them." However, this kind of evidence, while insufficient in itself to sustain a conviction, is not irrelevant. Such evidence, in the context of other evidence, may be of value in showing illegal advocacy.

Second, the *Yates* opinion also indicates what kind of evidence is sufficient. There the Court pointed to two series of events which justified the denial of directed acquittals as to nine of the *Yates* defendants. The Court noted that with respect to seven of the defendants, meetings in San Francisco which were described by the witness Foard might be considered to be "the systematic teaching and advocacy of illegal action which is condemned by the statute." 354 U. S., at 331. In those meetings, a small group of members were not only taught that violent revolution was inevitable, but they were also taught techniques for achieving that end. For example, the *Yates* record reveals that members were directed to be prepared to convert a general strike into a revolution and to deal with Negroes so as to prepare them specifically for revolution. In addition to the San Francsico meetings, the Court referred to certain activities in the Los Angeles area "which might be considered to amount to 'advocacy of action'" and with which two *Yates* defendants were linked. *Id.,* 331–332. Here again, the participants did not stop with teaching of the inevitability of eventual revolution, but went on to explain techniques, both legal and illegal, to be employed in preparation for or in connection with the revolution. Thus, one member was "surreptitiously indoctrinated in methods . . . of moving 'masses of people in time of crisis'"; others were told to adopt such Russian prerevolutionary techniques as the development of a special communication system through a newspaper similar to Pravda. *Id.,* 332. Viewed to-

gether, these events described in *Yates* indicate at least two patterns of evidence sufficient to show illegal advocacy: (a) the teaching of forceful overthrow, accompanied by directions as to the type of illegal action which must be taken when the time for the revolution is reached; and (b) the teaching of forceful overthrow, accompanied by a contemporary, though legal, course of conduct clearly undertaken for the specific purpose of rendering effective the later illegal activity which is advocated. Compare *Noto* v. *United States, post,* at 297–299.

Finally, *Yates* is also relevant here in indicating, at least by implication, the type and quantum of evidence necessary to attach liability for illegal advocacy to the Party. In discussing the Government's "conspiratorial-nexus theory" the Court found that the evidence there was insufficient because the incidents of illegal advocacy were infrequent, sporadic, and not fairly related to the period covered by the indictment. In addition, the Court indicated that the illegal advocacy was not sufficiently tied to officials who spoke for the Party as such.

Thus, in short, *Yates* imposes a strict standard of proof, and indicates the kind of evidence that is insufficient to show illegal advocacy under that standard, the kind of evidence that is sufficient, and what pattern of evidence is necessary to hold the Party responsible for such advocacy. With these criteria in mind, we now proceed to an examination of the evidence in this case.

We begin with what was also present in *Yates,* the general evidence as to the doctrines, organization, and tactical procedures of the Communist Party, exposited by Lautner, the Government's foundational witness both here and in *Yates.* Together with documentary evidence, Lautner's testimony, based on high-level participation in Party affairs from 1929 to 1950, furnished the necessary background in Party theory and terminology which is

crucial to the proper appreciation of the tenor of Party pronouncements, for these pronouncements, taken out of this larger context, might appear harmless and peaceable without in reality being so. The distinction that was drawn in *Yates* between theoretical advocacy and advocacy of violence as a rule of action is of course basic, but when the teaching is carried out in a special vocabulary, knowledge of that vocabulary is at least relevant to an understanding of the quality and tenor of the teaching.

Lautner's testimony, having covered the pre-war history of the Party, passed to the 1945 reconstitution of the organization. Prior to that time the Party, as the Communist Political Association, had adhered to the position that the change to a Communist society could be achieved through peaceful, democratic means. The reconstitution, which was finally approved at a National Convention in July of 1945, involved a return to the principles of Marxism-Leninism. As found in the so-called Communist classics, the adoption of a program of industrial concentration, the increased effort among Negroes, especially in the South, the complete repudiation of the former Party leader, Browder, and his doctrine of "revisionism," all signified, so Lautner testified, that the United States was henceforth to be regarded as no exception to the teachings of Lenin that communism could only be achieved in an industrialized nation such as this by resort to violent revolution, and that a belief in peaceful means was foolishness or treachery. Lautner testified that the industrial concentration program, as well as the emphasis on the Negro minority, was an articulation of this doctrine, in that it involved a concentration on those elements in society which the Party believed could do most damage, in time of crisis, to the existing social fabric in relation to their numbers, and that victory at the polls was not its concern. Lautner testified that it was further resolved at the 1945 National Convention that in order to imple-

ment the principles of the reconstitution, a program of thorough re-education of the whole Party membership should be undertaken, and Lautner himself was charged with the duty of carrying out this re-education as a District Organizer and State Chairman. The balance of Lautner's testimony was devoted to a detailed description of the elaborate underground "apparatus" which he and others were charged with setting up in the various portions of the country assigned to them.

Mrs. Hartle testified as to her activities in the Party, primarily in the Pacific Northwest area, from 1934 to approximately 1952. Mrs. Hartle confirmed, in many respects, Lautner's testimony as to Party teaching and doctrine throughout this period. After the 1945 reconstitution she was sent to the National Training School in New York, where thirty "officers and functionaries" from various parts of the country were "re-educated" in accordance with the decisions and resolutions of the 1945 Convention. She was taught about "dialectical materialism," and the theory of struggle between the capitalist class and the working class. They were taught "and reference was made to a quotation . . . that it is the duty of a revolutionary not to try to gloss over this class struggle or to try to compromise it, but to unravel it, to allow this class struggle and help this class struggle to unfold, the clash to proceed." The class was told that "it is the duty of a Marxist-Leninist to be a revolutionary and not a reformist." They were further instructed "that the United States . . . was objectively at the stage for Proletarian revolution," that the time for the proletariat revolution would come when the objective conditions of political or economic crisis coincided with the "subjective condition" of a Communist Party which was large enough, with enough "influence" among the working classes, "to give the necessary leadership to lead to the seizure of power."

Much of the testimony summarized so far may indeed be considered to relate to the mere theory of revolution, abstract advocacy. However, the teaching at the National Training School also descended to a lower level of generality. Mrs. Hartle was told that the "role" of the Communist Party was "preparing the workers and the people to be ready to be able to take power, to know how to take power" when a "revolutionary situation arose." At that time, "the plan and program of the Party would be to lead the working class to seize power" and "to smash the Bourgeois state machine." With respect to this latter task, the class was told:

> ". . . the Bourgeois state machine is not smashed after the seizure of power, but in the course of seizing power that the armies, the police, the prisons have to be dealt with and smashed up and rendered inoperative in the course of the seizure of power, that other matters, that some other matters in replacing the, a state, such as the, some of the administrative apparatus and some other matters would take a longer period of time, but the forcible elements of the capitalist state must be smashed in the course of taking power, but some other things like reorganizing the banking system, or some matters like that, could be done in a somewhat longer process."

In pressing toward the fulfillment of the "subjective conditions" necessary for such action, Mrs. Hartle was taught that "the struggles and activities of the Communist Party prepare the working class for this act of seizure of power," and the history of the Russian Communist Party and Revolution was taught in the school and the events and principles of this history were constantly related to contemporary conditions in the United States. Thus, for example, the class was told that the coalition of workers and peasants which had proved so successful

in Russia should have its counterpart in America in a coalition of workers and Negroes, especially in the South.

Following her classes at the National Training School, Mrs. Hartle returned to Washington, where she helped to recruit and organize in "underground fashion" the employees of the Boeing Aircraft Plant in that State. At the same time, Mrs. Hartle was active in Party schools in her area. She testified that she had both been instructed and had herself taught:

> ". . . the means by which the ultimate goal might be attained was that those means would be forcible. The teaching was that any teaching, any theory of a peaceful road to socialism, or a growing over from capitalism to socialism was a betrayal of the working class and that the Communist Party leading the working class would have to arm it in the first place with the theory that the workers must know and must be prepared to know that they can only take power forcibly.

> .        .        .        .        .

> "The action that Communist Party members should take in preparing for the ultimate goal that I was taught and that I taught, were to build the Communist Party as the vanguard party of the working class, a theoretically equipped party, equipped with the theory of Marxism-Leninism, a highly organized party that could act as a unit, as a monolithic whole, with democratic centralism, the principle guiding it . . . and that the Communist Party should be the connection between the vanguard and the working class millions in this preparation by working with and winning the confidence of the working class and allies of the working class, such as, the Negro people, the poor farmers, other national groups, and in this way, in the course of struggle, constant struggle taking the forms of strikes

and demonstrations and picket lines and marches and various kinds of activities to train the working class and the people for revolutionary battle."

The witness Duran, who attended a Party School in Los Angeles in 1951, described what he had been taught by one Moreau, a member of the National Education Commission of the Communist Party:

"He divided in his explanation the . . . Proletariat . . . as being divided into two groups. Those in industry that would lead the revolution, and those in agriculture that would follow, and speaking about the revolution, Professor Moreau stated to the class in a very emotional manner that he could see himself carrying a gun against the capitalist S. O. B.'s and explained to the class it was all based on the science of Marx and Lenin.

.         .         .         .         .

"In discussing the Proletarian Revolution more thoroughly Professor Moreau explained throughout the school that the Proletarian Revolution would only come about if a Bolshevik rank and file, the sincere Communists, would get out and teach, and teach the people, the desirability of changing the system and the necessity of changing them, and in doing that, we had to teach the people that you cannot change the capitalist system to a Socialist system, to socialism successfully, the peaceful way; it had to be erupted from, and had to be taken away by force and violence, away from them and the entire state machinery of the Bourgeoisie smashed, the F. B. I., the courts and the Army and the Navy, whatever was on it, what—the entire instrumentality of the Bourgeoisie had to be smashed and substituted by the Proletarian machinery.

". . . and during the period of the revolution the transition, the violent transition, we had to make

mass work to get the masses away from the Bourgeoisie so they would not join a counterrevolution movement.

"It meant after the people of the Communist Party, the vanguard, had become satisfied, that the Bourgeoisie machinery was smashed, and they were in control, then they also had to collect guns from the people and control the people themselves.

"Q. Do I understand, Mr. Moreau [sic] that during this period of revolution the people, that is, the masses of the people, would be carrying guns?

"A. Yes, sir.

"Q. And after the revolution do I understand that the Party would go around and collect these guns and take them away from the people?

"A. Yes, sir; take them away from those that helped them overthrow the capitalist system in order to assure the revolution itself. . . .

"Immediately after the overthrow of the capitalist system and establishment of the dictatorship of the Proletariat, it became necessary for a Communist to establish Red Army in this country, not only to secure and maintain the dictatorship of the Proletariat, but control the people as well, and those people that did help overthrow the Government would not have any civil rights whatsoever, no voting rights, or anything; they would be dished out to them according to the way they felt, way they fell in with the Communist office by the dictatorship.

"Q. Now, Mr. Duran, what, if anything, did Mr. Moreau teach you in this school about the role that would be played by the Communist Party during this period of revolution when the Government would be overthrown by force and violence?

"A. The role of the Communist Party, and specifically within the Communist Party, the Bolsheviks

was to play a vanguard role, a leading role; that is explained scientifically in that so that first we teach the people the desirability of overthrowing them and teach them the, it could only be done through the Proletarian Revolution, and then when the time is ripe we could stampede them against the capitalist class."

Duran also testified to what he had been taught by Art Berry, District Organizer for seven States, in a Colorado school in 1952:

". . . we were discussing the scientific application of Marx and Lenin to the transition period between capitalism and socialism, and he demonstrated this with the kettle of water, that you could put a quantitative amount of water in a kettle and set it somewhere, nothing would happen, just like the masses, nothing does happen.

". . . [he] said, however, if you get that same amount, same kettle with the same amount of water in it, and put fire underneath it, then you begin to get quantitative changes, and eventually it reaches a nodule point to where it has a qualitative and abrupt transition into steam. He continued, same applied to the development of the revolution in this sense, the American people will not and cannot make a successful change over from capitalism to socialism by themselves, like the fire underneath the water, the Communist Party teaches and leads them to where when the society reaches that nodule point, the Communist people teaches the people before and then leads them to make that abrupt change into the society of socialism.

.         .         .         .         .

"Substantially, within the same explanation of violent overthrow of the Government . . . he stated

that not only would it be that, but that we would have to set up barricades, establish a central point from where we would participate from; he stated the 'we' literally speaking 'we', would have to have a central point because during the revolution it may become necessary to ebb, retreat in certain battles, and we would have to learn to retreat in an organizational way and a correct way. It was essential to learn to ebb as it was to flow on the revolution.

"In the ebbing we were to see that we ebb before the enemy wiped everybody out. Ebbing to the central point that had been barricaded, reorganization, and then at the correct time start flowing forward in the revolution."

The witness Obadiah Jones testified concerning a Party Training School in St. Louis which he attended in 1947. Jones was taught "that the only way the national problem could be solved would be in connection with the Proletariat Revolution." Jones was also instructed as to the nature of a Communist army:

"A. He said general staff of an army was different from the Communist Party . . . general staff of an army operated from a safe spot from behind the line and led the army from a far distance, and that the Communist Party went forth and fought with the workers.

"Q. Did he say anything with reference to the techniques?

"A. Yes, he said that you couldn't be a good leader without knowing all of the techniques of fighting.

"Q. Did he say anything with respect to carrying out instructions?

"A. Yes, sir.

"Q. What did he say in that connection?

"A. He said that capitalists in the army did not

carry out the instructions in full, but the Communists did, irregardless of what the cost would be, they would carry out instructions completely."

At the final session, the students were required by the instructor to take a pledge:

"The pledge was each of us are Communists or members of the Party and each of us have a responsibility and we must carry out our responsibility and work for the interests of the Party and its recipients and carry out the full will of the Party even though it meant to fight and to kill, we must carry out the demands of the Party and all of them."

The witnesses Clontz, Childs, and Reavis testified primarily as to their dealings with petitioner Scales. We regard this testimony, which finds no counterpart in the *Yates* record with respect to any of the defendants whose acquittal was directed, as being of special importance in two ways: it supplies some of the strongest and most unequivocal evidence against the Party based on the statements and activities of a man whose words and deeds, by virtue of his high Party position, carry special weight in determining the character of the Party from the standpoint of the Smith Act; and it appears clearly dispositive as to the quality of petitioner's Party membership, and his knowledge and intent, when we come to consider him not as a Party official but as the defendant in this case.[23]

---

[23] Petitioner complains that the evidence as to Party activities emanating from such witnesses as Lautner, Hartle, Duran, and Jones, was inadmissible because not tied up with him. This confuses the nature of the offense Congress has created, for it is important as a preliminary matter, without adverting to the particular defendant in the prosecution, to prove the character of the organization of which he is charged with being a member. The other side of petitioner's claim on this score would entail giving greater or conclusive weight to petitioner's admissions as to the nature of the Party merely because he is the

In 1948 Ralph C. Clontz, Jr., then a student at Duke Law School, undertook to furnish the F. B. I. with information he had gained about Communist Party activities in North Carolina, and to volunteer his services in attempting to penetrate the Party to acquire further information. As a result, in September of that year, Clontz sent a postcard to petitioner, informing him that he was a law student and that he was interested in communism. Petitioner replied by sending Clontz "a large cardboard box filled with Communist literature." An accompanying letter, headed "Carolina District Communist Party U. S. A." with the notation "Junius Scales, Chairman," explained:

> "Under separate cover I have already sent you a rather varied sample of our literature. I hope you will give it close attention. If I can discuss any matter relating to my Party and its program with you in person, I will be glad to do so."

Several days later Clontz went to visit petitioner and thus began a relationship which was to bring him into intimate contact with the Communist Party, its teachings, purposes and activities.

At an early meeting between the two, petitioner told Clontz that it was impossible for the Communist Party to succeed to power through educating the people in this country and gaining their votes at the polls, but that a forceful revolution would be necessary. At a later meeting, the discussion was not limited to the theoretical inevitability of revolution, but went beyond the theory itself to an explanation of "basic strategy" which the

---

defendant in this case. But that would be as illogical on the preliminary question as would be excluding evidence not connected up with petitioner. The evidence as to Scales' words and deeds is weighty and strong against the Party only because of his position in the Party, not because he is the defendant here.

Communist Party was using to give concrete foundation to the theory, *i. e.*, to bringing about the revolution:

> "The defendant [petitioner] explained that basically their strategy was bottomed on a concept that there were two classes of people in this country, that could be used by the Communist Party to foment a revolution.
>
> "The first class he termed the working class or Proletariat, working class, he said, had as its natural born leaders or vanguard, the Communist Party.
>
> "The second class, he described, in this country was what he termed the Negro nation. The Negro nation he described as a separate nation in what he termed the Black Belt, including thirteen Southern States, and the strategy of the Communist Party was to bring the working class, led by the Communist Party, and what he termed the Negro nation, together, to bring about a forceful overthrow of the Government.
>
> "Now Scales and the Communist Party taught that the basic strategy of the Communist Party would never change, but that tactics might be altered as the situation changed."

On petitioner's invitation, Clontz joined the Communist Party on January 17, 1950. He was not assigned to a particular group but became a member "at large," in order to continue his instruction under petitioner. In the course of this instruction, petitioner repeatedly told Clontz of the necessity for revolution to bring about the Dictatorship of the Proletariat. Scales analogized the situation in the United States to that in Russia prior to the 1917 Revolution. He pointed out that revolution would be "easier" in this country than it had been in Russia:

> "that while in the Soviet Union there had been no one to help the Soviet Party, that in this country

when the revolution started, we would have the benefit of the help from the mother country, Russia, in bringing about our own revolution, because part of the purposes of the Communist Party in the Soviet Union was international in scope and that we naturally would continue to receive help in all circumstances from the Soviet Party when the revolution was started here in this country."

Petitioner explained that the Soviet Union could not be expected to land troops to start a revolution here. A similar procedure had been unsuccessful in China. Rather, he said "that we Communists in this country would have to start the revolution, and we would have to continue fighting it," but that the Soviet Union would aid the Communist Party in this endeavor by furnishing it "with experienced revolutionaries from Russia." [24] He added that "if the United States declared war on the Communists in their revolution, then the Soviet Union would land troops, and he said that would be a bloody time for all." When asked

---

[24] As stated by Clontz: "Scales said that we could not expect the Soviet Union to land troops to start our revolution and finish it.

"Scales further said that experience had taught the Communists that that sort of approach was disastrous, . . . that they in China, the Communists, had sent in Russian generals and the only result had been that the Chinese Communists had been licked completely, that the new approach, of the Soviet Union, was shown in the example of Mao, who was then Mao-Tse-Tung, who was then the leader in the Communist Chinese Government.

"He pointed out that Mao had never even been to Russia, but instead the Soviet Union and the Soviet Communist Party had sent over military leaders to instruct Mao, and his leaders, and had sent over professional revolutionaries that could aid them in bringing about their revolution.

"He said that we could count on drawing on the experience of the Soviet Union, and that they also would furnish us when the revolution came with experienced revolutionaries from Russia."

by Clontz when all this would occur, Scales noted that a "depression would greatly accelerate the coming of the revolution" if the Communists used it properly to prepare the masses of the people.

Petitioner arranged for Clontz to be awarded a scholarship to study in New York at the Jefferson School of Social Science, an official Communist Party School, during the month of August 1950. Because Clontz arrived at a time when few scheduled courses were being offered, the bulk of his training at the school was received in private instruction from Doxey A. Wilkerson, the teacher with whom petitioner had communicated in arranging Clontz' scholarship.[25] Wilkerson, like petitioner, told

---

[25] At one point in the course of instructing Clontz, Wilkerson wrote out the formula "M–L=F&V" which he told Clontz illustrated the position adopted by the appellate courts in the United States that Marxist-Leninist teaching equalled force and violence. Clontz testified:

"Doxey Wilkerson explained to me that since that formula had been established, action had had to be taken by the National Party to conceal the fact that their principles and their goal and their aims and their doctrines included forceful and violent revolution. He pointed out, for example, that an official statement had been issued by the Education Commission of the Communist Party U. S. A. disowning or disclaiming certain study outlines, certain texts, certain publications put out by the Communist Party.

"In fact, the order had ordered all Communist Party members to turn those in, and the statement, he said, after that particular date—I don't recall the exact date—had said henceforth, we will not recognize these as official Party publications.

"He said by doing that they accomplished two things. They, first of all, established a technicality for Communists on trial and their attorneys, that the Party no longer accepted Marxism-Leninism, because, he said, all Marxism-Leninism included in its teachings and in its concept the basis of a violent revolution.

"He said, secondly, that it did not unduly hamper the Communist Party, that in the future many things would be left unsaid that previously had been said, many things would be left unwritten that previously had been written, that, for example, in teaching a more

Clontz, "that the Communist Party recognized and expressed to themselves that the only kind of means would be proper means, which would be forceful means, that no longer was there any even pretense among intelligent Communists that any voting system or any people's election could bring this government." He also stated, as Scales had, that "the revolution basically would come about by combining the forces of what had been already identified as the Negro nation and the working class as the vanguard."

In line with this strategy, Wilkerson advised Clontz that he should not let his membership in the Communist Party become known, that by remaining "under cover" he "would be much more helpful to the Party when the revolution came." As part of his undercover activity, Clontz was directed to attempt to infiltrate various organizations of the working class in order to achieve "a background of respectability" and to be able to lead such organizations "toward the goal of the Communist Party, . . . the undermining of the Government and overthrowing the Government, bringing communism in the United States." But Clontz was not to lose contact with the Party, for if he "got isolated without Party direction . . . [his] efforts would be pretty

---

bare outline, would be given, and the instructor would fill in the revolutionary part, or the students would be sent into the Marxist-Leninist works as references to find the revolution, without having it spelled out in the outline.

"He said, that, naturally, would not change the basic Party goal or the basic aims of the Communist Party, but that it would make it more difficult for Communists to be convicted.

.      .      .      .      .

"One thing I recall during our discussion, he had given me a pamphlet, a study outline entitled White Chauvinism, and he pointed out to me, he said, 'Now I have been instructing you from that outline, but technically it is illegal because we Communists have disclaimed it, so that you are holding an illegal document there, actually.'"

largely wasted." In connection with these instructions, Wilkerson mentioned "one of the things that frightened the United States leaders was they knew that not only did they have to contend with China and the other Communist-dominated countries, but that also in every capitalist country the working class party, the Communists, would be working from within."

When Clontz returned to North Carolina, he reported to petitioner on his activities at the Jefferson School. He also informed petitioner, under instructions from the F. B. I., that he wished to move to New York. Petitioner arranged for Clontz to remain under his direction and to pay dues to him, while in New York, rather than effecting a formal transfer. Clontz moved to New York in March of 1951. While there Scales directed him to "get in with the A. C. L. U. organization to report on what value they might have in the coming struggle . . . ." Clontz had also been advised by an associate of petitioner to "infiltrate . . . the Civilian Defense setup."

The witnesses Childs and Reavis also testified to their relationship with Scales, who among other things arranged for their attendance at Party schools where their instruction followed much the same pattern as that described by Clontz.[26] In 1952 Childs attended a "Party

---

[26] One of Childs' early tasks, assigned him by the District Organizer, as a Communist Party member was to serve as bodyguard for a visiting official of the Civil Rights Congress. The official, accompanied by Childs and petitioner, spoke in Chapel Hill in February of 1951 on the Korean War. His theme, according to Childs, was "that the Korean War was being used by the capitalists as a means of oppressing the Negro people . . . that the capitalists are sending the Negroes to Korea to fight the Korean people who are trying to fight for their rights, the same as the Negro people are in the South." Childs took notes on the speech, and testified that the official's "exact words" were:

"In Korea they are still called niggers. Niggers are court-martialed for refusing to have their men slaughtered. Lieutenant Gilbert is one

Training School" of which petitioner was a director. The school was given "for outstanding cadres in the North and South Carolina and Virginia Districts of the Communist Party." It was held on a farm and strict security measures were taken. The District Organizer of Virginia instructed at the school. He told the students that "the role of the Communist Party is to lead the working masses to the overthrow of the capitalist government." With respect to the preliminary task of gaining the "broad coalition" necessary to achieve this task, he stated that,

". . . the Communist Party has a program of industrial concentration in which they try to get people, that is, people who are Communist Party members, into key shops or key industries which the Party has determined or designated to be industrial concentration industries or plants. This is so that the Communist Party members in a particular plant will be able to have a cell, or a Communist Party group in which they will be able to more effectively plan for such things as attempting to control the union in that particular plant."

And, in a compulsory recreation period, this same instructor gave a demonstration of jujitsu and, explaining that the students "might be able to use this on a picket line," how to kill a person with a pencil. According to Childs' testimony, "what he showed us to do was to take our pencil, . . . just take the pencil and place it simply in the palm of your hand so that the back will rest against the base of the thumb, and then we were to take it, and the person, and give a quick jab so that it would penetrate through here [demonstrating], and enter the

example. They say that the nigger is yellow. Yellow, give the niggers in North Carolina and Georgia rifles and tell them to fight for their rights. Yellow, man, you will see fighting like you have never seen before."

heart, and then if we could not do that, we just take it and grab it at the base of the throat."

Reavis attended the Party's New York Jefferson School in 1942. In a course on "Negro History" the students, drawn primarily from the South, were taught that ". . . the Negro people was the only revolutionary group within the United States that we could align themselves [sic] with, and hope to reach their [sic] gains through the avenue of force and violence, by overthrow of the Government, by Proletariat faction . . . ." Reavis was later advised to seek employment at the Western Electric Plant in Winston-Salem. He stated:

"I bumped into Mr. Scales at Harvey's home and I—the report said . . . the advice I'd been getting was confirmed by him. I advanced the question on what I should do in case I did get employment there at Western Electric, and I knew it was a, Government work, what I should do in case I was asked to sign certain papers, and I was told to do the same, that they had when signing a Taft-Hartley affidavit, to go ahead and sign them, that before they did, the defendant asked me if I had signed any papers that might be used as proof that I was in the Party, and I didn't remember any."

We conclude that this evidence sufficed to make a case for the jury on the issue of illegal Party advocacy. *Dennis* and *Yates* have definitely laid at rest any doubt that present advocacy of *future* action for violent overthrow satisfies statutory and constitutional requirements equally with advocacy of *immediate* action to that end. 341 U. S., at 509; 354 U. S., at 321. Hence this record cannot be considered deficient because it contains no evidence of advocacy for immediate overthrow.

Since the evidence amply showed that Party leaders were continuously preaching during the indictment period

the inevitability of eventual forcible overthrow, the first and basic question is a narrow one: whether the jury could permissibly infer that such preaching, in whole or in part, "was aimed at building up a seditious group and maintaining it in readiness for action at a propitious time . . . the kind of indoctrination preparatory to action which was condemned in *Dennis*." *Yates, supra,* at 321–322. On this score, we think that the jury, under instructions which fully satisfied the requirements of *Yates,*[27] was entitled to infer from this

[27] The trial court charged: "Moreover, the teaching in the abstract or teaching objectively, that is, teaching, discussing, explaining, or expounding what is meant by the aim or purpose of any author, group, or society of overthrowing the Government by force and violence is not criminal. For example, study and discussion by the Communist Party or by any other group in classrooms, or in study groups, or public or private meetings with the object of informing the participants or the audience of the aims and purposes of the doctrines of Marx, Lenin, Stalin, or the Communist Party is entirely lawful. Furthermore, without being criminal, the Communist Party could privately or publicly endeavor to persuade its members that they should adopt and espouse the belief that the Government of the United States should be overthrown by force and violence as speedily as circumstances will permit. This is no more than advocating an idea, and advocating an idea is no crime. Moreover, without transgressing the Smith Act, the Party might even instruct its members that it would be for their good and benefit, if this belief or idea were carried into effect.

"All of this is permissible because such utterances are protected by the First Amendment of the Federal Constitution, guaranteeing freedom of speech.

"However, if the Party went further, and with the intention of overthrowing the Government by force and violence, it taught, or advocated a rule or principle of action which both, one, called on its members to take forcible and concrete action at some advantageous time thereafter to overthrow the Government by force and violence, and, two, expressed that call in such written or oral words as would reasonably and ordinarily be calculated to incite its members to take concrete and forcible action for such overthrow; then, if the Com-

systematic preaching that where the explicitness and concreteness, of the sort described previously, seemed necessary and prudent, the doctrine of violent revolution—elsewhere more a theory of historical predictability than a rule of conduct—was put forward as a guide to future action, in whatever tone, be it emotional or calculating, that the audience and occasion required; in short, that "advocacy of action" was engaged in.

The only other question on this phase of the case is whether such advocacy was sufficiently broadly based to permit its attribution to the Party. We think it was. The advocacy of action was not "sporadic" (cf. p. 226, *supra*), the instances of it being neither infrequent, remote in time nor casual.[28] It cannot be said that

munist Party did that, the Party became such a society or group, as was outlawed by the Smith Act.

"To be criminal the teaching or advocacy, or the call to action just described need not be for immediate action, that is, for action today, tomorrow, next month, or next year. It is criminal, nonetheless, if the action is to be at an unnamed time in the future, to be fixed by the circumstances or on signal from the Party.

"It is criminal if it is a call upon the members to be ready, or to stand in readiness for action, or for a summons to action at a favorable, or opportune time in the future, or as speedily as circumstances will permit, provided always that the urging of such readiness be by words which would reasonably and ordinarily be calculated to spur a person to ready himself for, and to take action towards, the overthrow of the Government. But those to whom the advocacy or urging is addressed must be urged to do something now or in the future, rather than merely to believe in something. In other words, the advocacy must be of concrete action, and not merely a belief in abstract doctrine. However, the immediate concrete action urged should be intended to lead towards the forcible overthrow, and be so understood by those to whom the advocacy is addressed."

[28] Although most of the particularized evidence related to events not within the limitations period, it was of course open to the jury, under proper instructions which were given, to infer that such events reflected the character of Party advocacy during the limitations period. Petitioner does not contend to the contrary.

the jury could not have found that the criminal advocacy was fully authorized and condoned by the Party. We regard the testimony of the witnesses, whose credibility, of course, is not for us, as indicating a sufficiently systematic and substantial course of utterances and conduct on the part of those high in the councils of the Party, including the petitioner himself, to entitle the jury to infer that such activities reflected tenets of the Party. The testimony described activities in various States, including the teaching at some seven schools, among them the national Party school. The witnesses told of advocacy by high Party officials, including that of leaders of the Party in nine States. Further, there was testimony that the Party followed the principle of "democratic-centralism" whereby a position once adopted by the Party must be unquestionably adhered to by the whole membership. The conformity of the views expressed and the terms employed in advocating violent overthrow in such States as Washington, North Carolina, Missouri, Colorado and Virginia could reasonably be taken by the jury as a practical manifestation of "democratic-centralism." Another concrete illustration of this principle could have been found in the circumstance that in almost every instance where a speaker engaged in advocacy of violent overthrow, he not only advocated violence to his audience but urged others to go out and do likewise. All of these factors combine to justify the inference that the illegal individual advocacy as to which testimony was adduced was in truth the expression of Party policy and purpose.

The requirement of Party imputability is adequately met in the record. (See note 18, *supra.*)

The sufficiency of the evidence as to other elements of the crime requires no exposition. Scales' "active" membership in the Party is indisputable, and that issue was properly submitted to the jury under instructions that

were entirely adequate.[29]   The elements of petitioner's
"knowledge" and "specific intent" (*ante,* p. 220) require
no further discussion of the evidence beyond that already
given as to Scales' utterances and activities.   Compare
*Noto* v. *United States, post,* at 299–300.   They bear little
resemblance to the fragmentary and equivocal utterances
and conduct which were found insufficient in *Nowak* v.
*United States,* 356 U. S. 660, 666–667, and in *Maisenberg*
v. *United States,* 356 U. S. 670, 673.

We hold that this prosecution does not fail for insuf-
ficiency of the proof.

## IV.

### ALLEGED TRIAL ERRORS.

Petitioner contends that a number of errors were com-
mitted, having the effect of vitiating the fairness of his
trial.   For reasons substantially similar to those given
by the Court of Appeals (260 F. 2d 38–46), we find that
none of petitioner's contentions raise points meriting
reversal.

1. *Admission of Remote or Prejudicial Evidence.*

Petitioner complains as to the admission of certain
evidence relating to the Party's general or specific pur-
poses.   In particular, he objects to the admission of
evidence about the Party's program in the so-called
"Black Belt" and especially to the admission of a pam-
phlet called "I Saw the Truth in Korea," which contained

---

[29] The trial court charged: "The defendant admits that he was a
member of the Party.   For his membership to be criminal, however,
it is not sufficient that he be simply a member.   It must be more
than a nominal, passive, inactive, or purely technical membership.
In determining whether he was an active or inactive member, con-
sider how much of his time and efforts he devoted to the Party.   To
be active he must have devoted all, or a substantial part, of his time
and efforts to the Party."

a very gruesome description of alleged American atrocities
in Korea.  There can be no doubt that this matter, and
particularly the latter, would not have reflected well on
the petitioner or the Party in the eyes of the jury, but if
it was relevant to an element of the crime, then whether
its asserted prejudicial effect so far outweighed its proba-
tive value as to require exclusion of the evidence, was
a decision which rested in the sound discretion of the
trial judge.  Particularly in light of the fact that the most
damaging of this material emanated from petitioner him-
self (260 F. 2d, at 38), we cannot say that its admission
involved an abuse of discretion which would warrant our
reversal of the conclusions of the trial judge and the Court
of Appeals on this score.

We therefore need only consider whether the com-
plained-of evidence was legally relevant and therefore
admissible.  As we have pointed out in our review of
the record, the jury could have inferred that part of
the Communist Party's program for violent revolution was
the winning of favor with the Negro population in the
South, which it thought was particularly susceptible to
revolutionary propaganda and action.  Surely, then, the
evidence of the Party's teaching that the Negro popula-
tion should be given the right to form a separate nation
is not irrelevant to the issue of whether or not the Party's
program as a whole constituted a call to stand in readiness
for violent action, when this particular plank in the plat-
form was intended as bait for one of the substantial
battalions in the hoped-for revolutionary array.  Of
course, the preaching that the Negro population in the
South has the right to form a separate nation does not of
itself constitute illegal advocacy.  But neither does the
teaching of the abstract theory of Marxism-Leninism,
which we have held cannot alone form the basis for a
conviction for violation of the Smith Act, *Yates* v.
*United States, supra;* yet it cannot be seriously urged

that evidence of such teaching is legally irrelevant to the charge. Similarly the evidence of the pamphlet on alleged American atrocities in Korea cannot be said to be irrelevant to the issue of illegal advocacy by the Party. Once again, the pamphlet may not in itself constitute such an incitement to violence as would justify a finding that the Party advocated violent overthrow, but it is possible to infer from it that it was the purpose of the Party to undermine the Government in the eyes of the people in time of war as a preparatory measure, albeit legal in itself, to the teaching and sympathetic reception of illegal advocacy to violent revolution.

Petitioner also argues that this and other evidence was not connected up with him or his activities. Whether it was or not, since it is necessary under the membership clause to prove the advocacy of the Party as an independent element of the offense, this renders admissible evidence not connected up with the defendant in the accepted conspiracy sense. (See note 23, *supra*.) Doubtless because of this there is a special need to make sure that the evidence establishing a defendant's personal knowledge of illegal Party advocacy and his intent in becoming or remaining a Party member to accomplish violent overthrow is cogent and adequately brought home to him. But, having said that, we have said all, in respect to petitioner's claim on this point.

## 2. The "Jencks" Claim.

When this case was first before us we reversed the conviction, 355 U. S. 1, on the authority of our decision in *Jencks* v. *United States,* 353 U. S. 657. Before the second trial Congress enacted the so-called Jencks statute, 18 U. S. C. § 3500. Petitioner, as we understand him, does not now argue that that statute was incorrectly applied in his case; rather he attacks, on constitutional grounds, the statute itself. That the procedure set forth in the statute

does not violate the Constitution and that the procedure required by the decision of this Court in *Jencks* was not required by the Constitution was assumed by us in *Palermo* v. *United States,* 360 U. S. 343. It is enough to say here that there can be no complaint by a criminal defendant that he has been denied the opportunity to examine statements by government witnesses which do not relate to the subject matter of their testimony, for such statements bear no greater relevance to that testimony which he seeks to impeach than would statements by persons unconnected with the prosecution. Whether the statements so relate to prosecution testimony is a decision which is vested not in the Government but in the trial judge with full opportunity for appellate review. Once this question has been determined, whether the statements may be useful for purposes of impeachment is a decision which rests, of course, with the defendant himself.

Petitioner also objects to the limitation of the Act to written statements signed or adopted by the witness or to any form of substantially verbatim transcription of an oral statement by the witness. However, petitioner does not assert that he has been prejudiced by this provision, or that any statement or document requested by him was withheld on the authority of the statute. In these circumstances we perceive no basis for this aspect of petitioner's claims.

3. *Congressional Findings in the Communist Control Act of 1954 and the Internal Security Act of 1950.*

Petitioner asserts that the congressional findings as to the character of the Communist Party contained in both statutes deprived him of a fair trial on the issue of the character of the Party. That legislative action may have the effect of precluding a fair trial is not impossible, see *Delaney* v. *United States,* 199 F. 2d 107, but petitioner's claim here appears to be no more than an afterthought.

There is no showing of any prejudice, nor that during the *voir dire* examination of jurors petitioner attempted to ascertain whether any juror had even heard of these enactments, much less that petitioner attempted to have any juror disqualified on that ground. We cannot on this record regard this as a substantial contention.

Finally, for the reasons stated by the Court of Appeals, 260 F. 2d, at 44–46, we think that petitioner waived any right he might have had to question the method of choosing grand jurors by his failure to comply with Rule 12, Fed. Rules Crim. Proc., and further that no impropriety in the method of choosing grand jurors has been shown.

The judgment of the Court of Appeals must be

*Affirmed.*

MR. JUSTICE BLACK, dissenting.

Petitioner was convicted for violation of the "membership clause" of the Smith Act which imposes a penalty of up to twenty years' imprisonment together with a fine of $20,000 upon anyone who "becomes or is a member of, or affiliates with, any . . . society, group, or assembly of persons [who teach, advocate, or encourage the overthrow of the existing government by force or violence], knowing the purposes thereof . . . ."[1] Rejecting numerous contentions urged for reversal, the Court upholds a six-year sentence imposed upon petitioner under the authority of its prior decisions in *Dennis* v. *United States*[2] and *Yates* v. *United States.*[3] My reasons for dissenting from this decision are primarily those set out by MR. JUSTICE BRENNAN—that § 4 (f) of the Subversive Activities Control Act[4] bars prosecutions under the membership clause of the Smith Act—and MR. JUSTICE DOUGLAS—that the

[1] 18 U. S. C. § 2385.
[2] 341 U. S. 494.
[3] 354 U. S. 298.
[4] 50 U. S. C. § 783 (f).

First Amendment absolutely forbids Congress to outlaw membership in a political party or similar association merely because one of the philosophical tenets of that group is that the existing government should be overthrown by force at some distant time in the future when circumstances may permit. There are, however, two additional points that I think should also be mentioned.

In an attempt to bring the issue of the constitutionality of the membership clause of the Smith Act within the authority of the *Dennis* and *Yates* cases, the Court has practically rewritten the statute under which petitioner stands convicted by treating the requirements of "activity" and "specific intent" as implicit in words that plainly do not include them. Petitioner's conviction is upheld just as though the membership clause had always contained these requirements. It seems clear to me that neither petitioner nor anyone else could ever have guessed that this law would be held to mean what this Court now holds it does mean. For that reason, it appears that petitioner has been convicted under a law that is, at best, unconstitutionally vague and, at worst, *ex post facto*.[5] He has therefore been deprived of his right to

[5] The fact that the Court's rewriting of the statute has, in this case, narrowed the statute rather than broadened it does not change this conclusion. Petitioner has a right to have the constitutionality of the statute considered on the basis upon which it was originally written, for that was the condition of the statute when he violated it. The danger of the practice in which the Court is engaging is pointed up by its decision in the companion case, *Communist Party* v. *Subversive Activities Control Board, ante,* p. 1, in which it imposes the burden upon the members of that Party to guess as to what sections of the Subversive Activities Control Act will be held unconstitutional. The difficulty of that burden is tremendously increased by the decision in this case for they cannot know how many and what kind of additional requirements will be found to be "implied" and placed into the "balance" by which the constitutionality of questionable provisions of that Act will be determined.

be tried under a clearly defined, pre-existing "law of the land" as guaranteed by the Due Process Clause and I think his conviction should be reversed on that ground.[6]

Secondly, I think it is important to point out the manner in which this case re-emphasizes the freedom-destroying nature of the "balancing test" presently in use by the Court to justify its refusal to apply specific constitutional protections of the Bill of Rights. In some of the recent cases in which it has "balanced" away the protections of the First Amendment, the Court has suggested that it was justified in the application of this "test" because no direct abridgment of First Amendment freedoms was involved, the abridgment in each of these cases being, in the Court's opinion, nothing more than "an incident of the informed exercise of a valid governmental function." [7] A possible implication of that suggestion was that if the Court were confronted with what it would call a direct abridgment of speech, it would not apply the "balancing test" but would enforce the protections of the First Amendment according to its own terms. This case causes me to doubt that such an implication is justified. Petitioner is being sent to jail for the express reason that he has associated with people who have entertained unlawful ideas and said unlawful things, and that of course is a *direct* abridgment of his freedoms of speech and assem-

---

[6] *Cohen* v. *Hurley,* 366 U. S. 117, 131 (dissenting opinion). See also *Konigsberg* v. *State Bar of California,* 366 U. S. 36, 56 (dissenting opinion).

[7] *Konigsberg* v. *State Bar of California,* 366 U. S. 36, 51. See also *Uphaus* v. *Wyman,* 360 U. S. 72; *Barenblatt* v. *United States,* 360 U. S. 109; *Uphaus* v. *Wyman,* 364 U. S. 388; *Wilkinson* v. *United States,* 365 U. S. 399; *Braden* v. *United States,* 365 U. S. 431; *In re Anastaplo,* 366 U. S. 82. In each of these cases, I disagreed, as I still do, with the majority's characterization of the abridgment involved as "incidental," as I understand that term to have significance in First Amendment cases. See particularly my dissenting opinion in the *Konigsberg* case, *supra,* at 68–71.

bly—under any definition that has ever been used for that term. Nevertheless, even as to this admittedly direct abridgment, the Court relies upon its prior decisions to the effect that the Government has power to abridge speech and assembly if its interest in doing so is sufficient to outweigh the interest in protecting these First Amendment freedoms.[8]

This, I think, demonstrates the unlimited breadth and danger of the "balancing test" as it is currently being applied by a majority of this Court. Under that "test," the question in every case in which a First Amendment right is asserted is not whether there has been an abridgment of that right, not whether the abridgment of that right was intentional on the part of the Government, and not whether there is any other way in which the Government could accomplish a lawful aim without an invasion of the constitutionally guaranteed rights of the people. It is, rather, simply whether the Government has an interest in abridging the right involved and, if so, whether that interest is of sufficient importance, in the opinion of a majority of this Court, to justify the Government's action in doing so. This doctrine, to say the very least, is capable of being used to justify almost any action Government may wish to take to suppress First Amendment freedoms.

Mr. Justice Douglas, dissenting.

When we allow petitioner to be sentenced to prison for six years for being a "member"of the Communist Party, we make a sharp break with traditional concepts of First Amendment rights and make serious Mark Twain's light-hearted comment that "It is by the goodness of God that in our country we have those three unspeakably precious

---

[8] The decisions in both of the cases upon which the Court here relies were rested on the "balancing test." See *Dennis* v. *United States, supra,* at 506–511; *Yates* v. *United States, supra,* at 321.

things: freedom of speech, freedom of conscience, and the prudence never to practice either of them." [1]

Even the Alien and Sedition Laws—shameful reminders of an early chapter in intolerance—never went so far as we go today. They were aimed at conspiracy and advocacy of insurrection and at the publication of "false, scandalous and malicious" writing against the Government, 1 Stat. 596. The Government then sought control over the press "in order to strike at one of the chief sources of disaffection and sedition." Miller, Crisis in Freedom (1951), p. 56. There is here no charge of conspiracy, no charge of any overt act to overthrow the Government by force and violence, no charge of any other criminal act. The charge is being a "member" of the Communist Party, "well-knowing" that it advocated the overthrow of the Government by force and violence, "said defendant intending to bring about such overthrow by force and violence as speedily as circumstances would permit." That falls far short of a charge of conspiracy. Conspiracy rests not in intention alone but in an agreement with one or more others to promote an unlawful project. *United States* v. *Falcone*, 311 U. S. 205, 210; *Direct Sales Co.* v. *United States*, 319 U. S. 703, 713. No charge of any kind or sort of agreement hitherto embraced in the concept of a conspiracy is made here.

We legalize today guilt by association, sending a man to prison when he committed no unlawful act. Today's break with tradition is a serious one. It borrows from the totalitarian philosophy. As stated by O'Brian, National Security and Individual Freedom (1955), pp. 27–28:

"The Smith Act of 1940 *made it unlawful* for any person to be or to become a member of or affiliate with any society, group, or assembly which teaches,

---

[1] Following the Equator (1903), Vol. I, p. 198.

advocates, or encourages the overthrow or destruction of any government in the United States by force or violence. These statutes [the Smith Act together with a 1920 amendment to the Immigration Law, Act of June 5, 1920, 41 Stat. 1008], therefore, imported into our law the alien doctrine of guilt by association, which up to this time had been regarded as abhorrent and which had never been recognized either by the courts or by the Department of Justice, even during the perils and excitements of the First World War."

The case is not saved by showing that petitioner was an active member. None of the activity constitutes a crime. The record contains evidence that Scales was the Chairman of the North and South Carolina Districts of the Communist Party. He recruited new members into the Party, and promoted the advanced education of selected young Party members in the theory of communism to be undertaken at secret schools. He was a director of one such school. He explained the principles of the Party to an FBI agent who posed as someone interested in joining the Party, and furnished him literature, including articles which criticized in vivid language the American "aggression" in Korea and described American "atrocities" committed on Korean citizens. He once remarked that the Party was setting up underground means of communication, and in 1951 he himself "went underground." At the school of which Scales was director, students were told (by someone else) that one of the Party's weaknesses was in failing to place people in key industrial positions. One witness told of a meeting arranged by Scales at which the staff of the school urged him to remain in his position in an industrial plant rather than return to college. In Scales' presence, students at the school were once shown how to kill a person with a pencil, a device which, it was said, might come in handy

on a picket line. Other evidence showed Scales to have made several statements or distributed literature containing implicating passages. Among them were comments to the effect that the Party line was that the Negroes in the South and the working classes should be used to foment a violent revolution; that a Communist government could not be voted into power in this country because the Government controlled communication media, newspapers, the military, and the educational systems, and that force was the only way to achieve the revolution; that if a depression were to come the Communist America would be closer at hand than predicted by William Z. Foster; that the revolution would come within a generation; that it would be easier in the United States than in Russia to effectuate the revolution because of assistance and advice from Russian Communists. Petitioner at different times said or distributed literature which said that the goals of communism could only be achieved by violent revolution that would have to start internally with the working classes.

Not one single illegal act is charged to petitioner. That is why the essence of the crime covered by the indictment is merely belief [2]—belief in the proletarian revolution, belief in Communist creed.

---

[2] The prototype of the present prosecution is found in Communist lands. The Communist Government in Czechoslovakia on October 6, 1948, promulgated a law, § 3 of which provided:

"(1) Whoever publicly or before several people instigates against the Republic, against its independence, constitutional unity, territorial integrity or its people's democratic system [of government], its social or economic order, or against its national character as guaranteed by the Constitution, shall be punished for a minor crime by rigorous confinement for from three months to three years.

"(2) The following shall be punished in like manner: Whoever intentionally or through gross negligence makes the dissemination of the instigative statement specified in Subsection 1 possible or easy."

Spinoza summed up in a sentence much of the history of the struggle of man to think and speak what he believes:

"Laws which decree what every one must believe, and forbid utterance against this or that opinion, have too often been enacted to confirm or enlarge the power of those who dared not suffer free inquiry to be made, and have by a perversion of authority turned the superstition of the mob into violence against opponents." *Tractatus Theologico-Politicus* (London 1862) p. 349.

"The thought of man shall not be tried, for the devil himself knoweth not the thought of man," said Chief Justice Brian in Y. B. Pasch, 17 Edw. IV, f. 2, pl. 2. The crime of belief—presently prosecuted—is a carryback to the old law of treason where men were punished for compassing the death of the King. That law, which had been employed for "suppression of political opposition or the expression of ideas or beliefs distasteful to those in power," Hurst, Historic Background of the Treason Clause, 6 Fed. B. J. 305, 307, was rejected here, and the treason clause of our Constitution was "most praised for the reason that it prevented the use of treason trials as an instrument of political faction." *Id.*, 307. Sedition or treason in the realm of politics and heresy in the ecclesiastical field had long centered on *beliefs* as the abhorrent criminal act. The struggle on this side of the Atlantic was to get rid of that concept and to punish men not for what they thought but for overt acts against the peace of the Nation. *Cramer* v. *United States,* 325 U. S. 1, 28–30. Montesquieu, who was a force in the thinking of those times (*id.*, 15, n. 21), proclaimed against punishing thoughts or words:

"There was a law passed in England under Henry VIII, by which whoever predicted the king's death

was declared guilty of high treason. This law was extremely vague; the terror of despotic power is so great that it recoils upon those who exercise it. In the king's last illness, the physicians would not venture to say he was in danger; and surely they acted very right. . . . Marsyas dreamed that he had cut Dionysius's throat. Dionysius put him to death, pretending that he would never have dreamed of such a thing by night if he had not thought of it by day. This was a most tyrannical action: for though it had been the subject of his thoughts, yet he had made no attempt towards it. The laws do not take upon them to punish any other than overt acts." The Spirit of Laws (1949), Vol. 1, pp. 192–193.

"Words do not constitute an overt act; they remain only in idea." *Id.,* 193.

These were the notions that led to the restrictive definition of treason, presently contained in Art. III, § 3, of the Constitution, which requires overt acts. *Cramer* v. *United States, supra; Haupt* v. *United States,* 330 U. S. 631, 645 (concurring opinion); Hurst, Treason in the United States, 58 Harv. L. Rev. 395. Our long and painful experience with the law of treason, wholly apart from the First Amendment, should be enough warning that we as a free people should not venture again into the field of prosecuting beliefs.

That was the philosophy behind *Board of Education* v. *Barnette,* 319 U. S. 624, 641–642:

"We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes. When they are so harmless to others or to the State as those we deal with here, the price is not too great. But freedom to differ is not limited to things that do not matter much. That

would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us."

Nothing but beliefs is on trial in this case. They are unpopular and to most of us revolting. But they are nonetheless ideas or dogmas or faiths within the broad framework of the First Amendment. See *Barenblatt* v. *United States,* 360 U. S. 109, 145–152 (dissent). The creed truer to our faith was stated by the Bar Committee headed by Charles E. Hughes which in 1920 protested the refusal of the New York Assembly to seat five members of the Socialist Party: [3]

". . . it is of the essence of the institutions of liberty that it be recognized that guilt is personal and cannot be attributed to the holding of opinion or to mere intent in the absence of overt acts . . . ."

Belief in the principle of revolution is deep in our traditions. The Declaration of Independence [4] proclaims it:

"whenever any Form of Government becomes destructive of these Ends, it is the Right of the People

---

[3] N. Y. L. Doc., 143d Sess., 1920, Vol. 5, No. 30, p. 4.

[4] "When honest men are impelled to withdraw their allegiance to the established law or custom of the community, still more when they are persuaded that such law or custom is too iniquitous to be longer tolerated, they seek for some principle more generally valid, some 'law' of higher authority, than the established law or custom of the community. To this higher law or more generally valid principle

to alter or to abolish it, and to institute new Government, laying its Foundation on such Principles, and organizing its Powers in such Form, as to them shall seem most likely to effect their Safety and Happiness."

This right of revolution has been and is a part of the fabric of our institutions.[5]  Last century when Russia invaded Hungary and subdued her, Louis Kossuth came here to enlist American support.  On January 8, 1852, Lincoln spoke in sympathy of the Hungarian cause and was a member of a committee which on January 9, 1852, submitted Resolutions in Behalf of Hungarian Freedom. Among these resolutions was one that read:

"That it is the right of any people, sufficiently numerous for national independence, to throw off, to revolutionize, their existing form of government, and to establish such other in its stead as they may choose."  Basler, Vol. II, The Collected Works of Abraham Lincoln (1953), p. 115.

On January 12, 1848, Lincoln in an address before the United States House of Representatives stated: "Any people anywhere, being inclined and having the power, have the *right* to rise up, and shake off the existing government, and form a new one that suits them better. This is a most valuable,—a most sacred right—a right,

---

they then appeal in justification of actions which the community condemns as immoral or criminal.  They formulate the law or principle in such a way that it is, or seems to them to be, rationally defensible. To them it is 'true' because it brings their actions into harmony with a rightly ordered universe, and enables them to think of themselves as having chosen the nobler part, as having withdrawn from a corrupt world in order to serve God or Humanity or a force that makes for the highest good."  Becker, The Declaration of Independence (1942), pp. 277–278.

[5] See the Appendix to this opinion, *post,* p. 275.

270

which we hope and believe, is to liberate the world." *Id.,* Vol. I, p. 438.

Of course, government can move against those who take up arms against it. Of course, the constituted authority has the right of self-preservation. But we deal in this prosecution of Scales only with the legality of ideas and beliefs, not with overt acts. The Court speaks of the prevention of "dangerous behavior" by punishing those "who work to bring about that behavior." That formula returns man to the dark days when government determined what behavior was "dangerous" and then policed the dissidents for tell-tale signs of advocacy. What is "dangerous behavior" that must be suppressed in its talk-stage has had a vivid history even on this continent. The British colonial philosophy was summed up by Sir William Berkeley, who served from 1641 to 1677 as Virginia's Governor: ". . . I thank God, *there are no free schools* nor *printing,* and I hope we shall not have these hundred years; for *learning* has brought disobedience, and heresy, and sects into the world, and *printing* has divulged them, and libels against the best government. God keep us from both!" 2 Hening's Stat. Va. 1660–1682, p. 517. The history is familiar; much of it is reviewed in Chafee, The Blessings of Liberty (1956). He states in one paragraph what I think is the Jeffersonian conception of the First Amendment rights involved in the present case:

"We must choose between freedom and fear—we cannot have both. If the citizens of the United States persist in being afraid, the real rulers of this country will be fanatics fired with a zeal to save grown men from objectionable ideas by putting them under the care of official nursemaids." *Id.,* 156.

In recent years we have been departing, I think, from the theory of government expressed in the First Amendment. We have too often been "balancing" the right of

speech and association against other values in society to see if we, the judges, feel that a particular need is more important than those guaranteed by the Bill of Rights. *Dennis* v. *United States,* 341 U. S. 494, 508–509; *Communications Assn.* v. *Douds,* 339 U. S. 382, 399–400; *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449, 463–466; *Uphaus* v. *Wyman,* 360 U. S. 72, 78–79; *Barenblatt* v. *United States,* 360 U. S. 109, 126–134; *Bates* v. *Little Rock,* 361 U. S. 516, 524; *Shelton* v. *Tucker,* 364 U. S. 479; *Wilkinson* v. *United States,* 365 U. S. 399; *Braden* v. *United States,* 365 U. S. 431; *Konigsberg* v. *State Bar,* 366 U. S. 36; *In re Anastaplo,* 366 U. S. 82. This approach, which treats the commands of the First Amendment as "no more than admonitions of moderation" (see Hand, The Spirit of Liberty (1960 ed.), p. 278), runs counter to our prior decisions. See *Lovell* v. *Griffin,* 303 U. S. 444, 450; *Murdock* v. *Pennsylvania,* 319 U. S. 105, 108; *Board of Education* v. *Barnette,* 319 U. S. 624, 639.

It also runs counter to Madison's views of the First Amendment as we are advised by his eminent biographer, Irving Brant:

> "When Madison wrote, 'Congress shall make no law' infringing these rights, he did not expect the Supreme Court to decide, on balance, whether Congress could or could not make a law infringing them. It was true, he observed in presenting his proposals, that state legislative bodies had violated many of the most valuable articles in bills of rights. But that furnished no basis for judging the effectiveness of the proposed amendments:
>
> " 'If they are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or

Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights.'

"This statement by Madison, along with all the rest of his speech, is so devastating to the 'balance theory' that efforts have been and are being made to discredit its authenticity. The *Annals of Congress,* it is said, is not an official document, but a compilation of stenographic reports (by a shorthand reporter admitted to the floor for that purpose) published in the press and containing numerous errors. That is true, although the chief complaint was that partially caught sentences were meaningless. In general, that which was clearly reported was truly reported. In the case of this all-important speech, Madison spoke from notes, and the notes in his handwriting are in the Library of Congress. They parallel the speech from end to end, scantily, but leaving no doubt of the fundamental faithfulness of the report." The Madison Heritage, 35 N. Y. U. L. Rev. 882, 899–900.

Brant goes on to relate how Madison opposed a resolution of censure against societies creating the political turmoil that was behind the Whiskey Rebellion. *Id.,* p. 900. He expressed in the House the view that opinions are not objects of legislation. "If we advert to the nature of Republican Government, we shall find that the censorial power is in the people over the Government, and not in the Government over the people." *Id.,* p. 900.

The trend of history, as Jefferson noted, has been against the rights of man. He wrote that "The natural progress of things is for liberty to yield and government to gain ground." [6] The formula he prepared for a society where ideas flourished was not punishment of the unorthodox

---

[6] 7 The Writings of Thomas Jefferson (Memorial ed. 1903) p. 37.

but education and enlightenment of the masses. Jefferson wrote to Madison on December 20, 1787: [7]

"I own, I am not a friend to a very energetic government. It is always oppressive. It places the governors indeed more at their ease, at the expense of the people. The late rebellion in Massachusetts has given more alarm, than I think it should have done. Calculate that one rebellion in thirteen States in the course of eleven years, is but one for each State in a century and a half. No country should be so long without one. Nor will any degree of power in the hands of government, prevent insurrections. In England, where the hand of power is heavier than with us, there are seldom half a dozen years without an insurrection. In France, where it is still heavier, but less despotic, as Montesquieu supposes, than in some other countries, and where there are always two or three hundred thousand men ready to crush insurrections, there have been three in the course of the three years I have been here, in every one of which greater numbers were engaged than in Massachusetts, and a great deal more blood was spilt. In Turkey, where the sole nod of the despot is death, insurrections are the events of every day. Compare again the ferocious depredations of their insurgents, with the order, the moderation and the almost self-extinguishment of ours. And say, finally, whether peace is best preserved by giving energy to the government, or information to the people. This last is the most certain, and the most legitimate engine of government. Educate and inform the whole mass of the people. Enable them to see that it is their

[7] 6 The Writings of Thomas Jefferson (Memorial ed. 1903) pp. 391–392.

interest to preserve peace and order, and they will preserve them. And it requires no very high degree of education to convince them of this. They are the only sure reliance for the preservation of our liberty."

This is the only philosophy consistent with the First Amendment. When belief in an idea is punished as it is today, we sacrifice those ideals and substitute an alien, totalitarian philosophy in their stead.[8]

---

[8] Gellhorn, American Rights (1960), in commenting on *Dennis* v. *United States*, 341 U. S. 494, and *Yates* v. *United States*, 354 U. S. 298, states:

"The aftermath of the *Yates* case is interesting. By the end of 1956 convictions of Communist leaders under the Smith Act had numbered 114. Many of these cases were still pending in the appellate courts when the *Yates* decision was announced in June of 1957. On one ground or another, convictions were set aside and new trials were granted to many of these defendants. The Department of Justice itself dropped the prosecution of a considerable number, on the ground that they could not properly be convicted on the basis of the evidence now available. Most significantly of all, the cases against the nine remaining defendants in *Yates*, as to whom the Supreme Court had refused to dismiss the charges, were abandoned by the prosecution because there was insufficient evidence that they had advocated action as distinct from opinion. After all the clamor, after all the expressed alarm about the peril into which the United States was being plunged by this handful of misguided fanatics, the prosecution felt itself unable to show persuasively that the Communist spokesmen had engaged in the forbidden incitements to illegality.

"This should stimulate a sober second look at the surface attractions of programs of suppression and coercion. Occasionally the supporters of these programs are scoundrels who falsely parade themselves as upholders of democracy; but more often they are good and sincere men. Men genuinely devoted to worthy ends sometimes endorse efforts to force unanimity of sentiment, not because they consciously espouse authoritarianism, but because they hope thus to assure maximum support for the nation and its people. No matter how well intentioned they may be, however, those efforts themselves create a graver danger than they overcome. The perils sought to be suppressed are regularly overestimated. History shows in one example after another how excessive have been the fears of earlier

"The most indifferent arguments," Bismarck said, "are good when one has a majority of bayonets." That is also true when one has the votes.

What we lose by majority vote today may be reclaimed at a future time when the fear of advocacy, dissent, and nonconformity no longer cast a shadow over us.

### APPENDIX TO OPINION OF MR. JUSTICE DOUGLAS.

The constitutions of 15 States have, at one time or another, made specific provision for the right of revolution by reserving to the people the right to "alter, reform or abolish" the existing frame of government. See Pennsylvania Const. of 1873, Art. I, § 2; Maryland Const. of 1867, Dec. of Rights, Art. I; Virginia Const. of 1902, Art. I, § 3; Alabama Const. of 1865, Art. I, § 2; Arkansas Const. of 1874, Art. II, § 1; Idaho Const. of 1889, Art. I, § 2; Kansas Const. of 1858, Art. I, § 2; Kentucky Const. of 1890, Bill of Rights, § 4; Ohio Const. of 1851, Art. I, § 2; Oregon Const. of 1857, Art. I, § 1; Tennessee Const. of 1870, Art. I, § 1; Texas Const. of 1876, Art. I, § 2; Vermont Const. of 1793, c. 1, Art. 7; West Virginia Const. of 1872, Art. 3, § 3; Wyoming Const. of 1889, Art. I, § 1. Some 24 other States have, or have had, slightly varying forms of the same provision. See New Hampshire Const., Pt. I, Art. 10; Massachusetts Const.,

---

generations, who shuddered at menaces that, with the benefit of hindsight, we now know were mere shadows. This in itself should induce the modern generation to view with prudent skepticism the recurrent alarms about the fatal potentialities of dissent. In any event, in a world torn between the merits of freedom and the blandishments of totalitarian power, the lovers of freedom cannot afford to sacrifice their moral superiority by adopting totalitarian methods in order to create a self-deluding sense of security. Suppression, once accepted as a way of life, is likely to spread. It reinforces the herd urge toward orthodoxies of all kinds—religious, economic, and moral as well as political." Pp. 82–83.

Part the First, Article VII; Connecticut Const., Article First, § 2; New Jersey Const., Art. I, ¶ 2; Delaware Const., Preamble; North Carolina Const., Art. I, § 3; South Carolina Const., Art. 1, § 1; Rhode Island Const., Art. I, § 1; California Const., Art. I, § 2; Colorado Const., Art. II, § 2; Florida Const., Dec. of Rights, § 2; Indiana Const., Art. I, § 1; Iowa Const., Art. I, § 2; Maine Const., Art. I, § 2; Michigan Const. of 1835, Art. I, § 2; Minnesota Const., Art. I, § 1; Mississippi Const., Art. 3, § 6; Missouri Const., Art. I, § 3; Montana Const., Art. III, § 2; Nevada Const., Art. I, § 2; North Dakota Const., Art. I, § 2; Oklahoma Const., Art. II, § 1; South Dakota Const., Art. VI, § 26; Utah Const., Art. I, § 2. The older constitutions often add a clause which shows the roots of these provisions in the right of revolution. "The doctrine of non-resistance against arbitrary power and oppression is absurd, slavish, and destructive of the good and happiness of mankind," the New Hampshire Const., Pt. I, Art. 10, recites. The same language may be found in Maryland Const., Dec. of Rights, Art. 6; Tennessee Const., Art. I, § 2.

These provisions have been considered by several state courts. It has been held that the general right of the people to alter or abolish the government does not deprive state courts from passing on the validity of constitutional amendments peacefully passed. *Wells* v. *Bain,* 75 Pa. St. 39, 46–49; *Koehler & Lange* v. *Hill,* 60 Iowa 543, 614–617, 15 N. W. 614–616; *Bennett* v. *Jackson,* 186 Ind. 533, 538–541, 116 N. E. 921, 922–923; *Erwin* v. *Nolan,* 280 Mo. 401, 406–407, 217 S. W. 837, 838–839. More recently, several state courts have had occasion to consider these provisions in connection with the persecution of Communists. See *Commonwealth* v. *Widovich,* 295 Pa. 311, 317–318, 145 A. 295, 297–298 (State Sedition Act); *Nelson* v. *Wyman,* 99 N. H. 33, 50–51, 105 A. 2d 756, 770–771 (legislative investigation); *Braverman* v.

*Bar Assn. of Balto.,* 209 Md. 328, 346–347, 121 A. 2d 473, 481–482 (disbarment of a lawyer convicted under the Smith Act). The last two of these decisions relied on language in the decision of this Court in *Dennis* v. *United States,* 341 U. S. 494, 501: "Whatever theoretical merit there may be to the argument that there is a 'right' to rebellion against dictatorial governments is without force where the existing structure of the government provides for peaceful and orderly change."

Yet the right of revolution has always meant more than this. "The words . . . ," said the court in *Wells* v. *Bain, supra,* 47, "embrace but three known recognised modes by which the whole people, the state, can give their consent to an alteration of an existing lawful frame of government, viz.:

"1. The mode provided in the existing constitution.

"2. A law, as the instrumental process of raising the body for revision and conveying to it the powers of the people.

"3. A revolution.

"The first two are peaceful means through which the consent of the people to alteration is obtained, and by which the existing government consents to be displaced without revolution. The government gives its consent, either by pursuing the mode provided in the constitution, or by passing a law to call a convention. If consent be not so given by the existing government the remedy of the people is in the third mode—revolution."

This does not mean the helplessness of the established government in the face of armed resistance, for that government has the duty of maintaining existing institutions. *Wells* v. *Bain, supra,* 49. But it does mean that the right of revolution is ultimately reserved to the people themselves, whatever formal, but useless, remedies the existing government may offer. This is shown in the history of our own revolution. Legislatures and governments have

the right to protect themselves. They may judge as to the appropriate means of meeting force directed against them, but as to the propriety of the exercise of the ultimate right of revolution, there, as John Locke says, "The people shall be judge." Second Treatise on Civil Government, § 240. To forbid the teaching of the propriety of revolution, even where the teacher believes his own lesson, is to hinder the people in the free exercise of this great sovereign right. See *Dennis* v. *United States,* 341 U. S. 494, 581–586 (dissenting opinion).

Lincoln's full statement, made in 1848 and already referred to, reads:

"Any people anywhere, being inclined and having the power, have the *right* to rise up, and shake off the existing government, and form a new one that suits them better. This is a most valuable,—a most sacred right—a right, which we hope and believe, is to liberate the world. Nor is this right confined to cases in which the whole people of an existing government, may choose to exercise it. Any portion of such people that *can, may* revolutionize, and make their *own,* of so much of the teritory [*sic*] as they inhabit. More than this, a *majority* of any portion of such people may revolutionize, putting down a *minority,* intermingled with, or near about them, who may oppose their movement. Such minority, was precisely the case, of the tories of our own revolution. It is a quality of revolutions not to go by *old* lines, or *old* laws; but to break up both, and make new ones." I Basler, The Collected Works of Abraham Lincoln (1953), pp. 438–439.

Mr. Justice Brennan, with whom The Chief Justice and Mr. Justice Douglas join, dissenting.

I think that in § 4 (f) of the Internal Security Act Congress legislated immunity from prosecution under the

membership clause of the Smith Act. The first sentence of § 4 (f) is: "Neither the holding of office nor membership in any Communist organization by any person shall constitute per se a violation of subsection (a) or subsection (c) of this section or of any other criminal statute." The immunity granted by that sentence is not in my view restricted, as the Court holds, to *mere* membership, that is to membership which is nominal, passive or theoretical. The immunity also extends to "active and purposive membership, purposive that is as to the organization's criminal ends," which is the character of membership to which the Court today restricts the application of the membership clause of the Smith Act.

In its approach to the relation of the first sentence of § 4 (f) to the membership clause of the Smith Act, I think the Court asks the wrong question. The question is not whether the Congress meant in § 4 (f) to "repeal" the membership clause of the Smith Act. The "repeal" of a statute connotes its erasure from the statute books. The grant of immunity from prosecution under a criminal statute merely suspends prosecution under the statute so long as the immunity is not withdrawn. For example, when we recently decided in *Reina* v. *United States,* 364 U. S. 507, that the Narcotic Control Act of 1956 legislated immunity from prosecution under state, as well as federal, narcotics laws, our decision did not remotely suggest that the immunity effected the "repeal" of either the state or the federal criminal statutes.

The Congress was faced with a dilemma in legislating the policy of compulsory registration of Communists into the Internal Security Act. This statute represented, in the words of the late John W. Davis, a policy of "ventilation rather than prohibition." Communists were to be forced to expose themselves to public view in order that the menace they present might be dealt with more effectively. The registration provisions of the Act are the

very vitals of that measure. But compulsory disclosure of membership would compel admission of a crime, or provide a link to proof of a crime. Communists then could invoke their constitutional right to silence and the registration provisions would be wrecked on the rock of the Self-Incrimination Clause of the Fifth Amendment. It is no disparagement of the Congress to say that their deliberations reflect great uncertainty how to resolve the dilemma. Congress wrote the Internal Security Act knowing that the privilege against self-incrimination was a solid barrier against compulsory self-incrimination by congressional fiat. The legislative history of § 4 (f) is murky but I think there clearly emerges a congressional decision to extend immunity from prosecution for any membership in a Communist organization in order to safeguard against constitutional frustration the policy of disclosure embodied in the registration provisions.[1]

---

[1] Senator McCarran, the floor manager of the bill in the Senate, spoke of the exposure of Communists as one of the "principal objectives" of the bill. 96 Cong. Rec. 14174.

The other principal objective was the definition of certain conduct as criminal, it being the sense of Congress that existing provisions to preserve the security of the Nation were inadequate (H. R. Rep. No. 2980, 81st Cong., 2d Sess., p. 2; S. Rep. No. 1358, 81st Cong., 2d Sess., p. 7; 96 Cong. Rec. 14174–14175) and not effective to combat the threat of subversion from within. The criminal provisions of the Internal Security Act are broad and comprehensive. Section 4 (a) prohibits conspiracy to perform any act which would substantially contribute to the establishment of a totalitarian dictatorship under the direction and control of a foreign power. Section 4 (b) makes it unlawful for a government employee without authorization to communicate classified information to anyone whom he believes to be a representative of a foreign government or member of a Communist organization, and § 4 (c) prohibits the receipt of such information. Section 10 prohibits a Communist organization from using the mails or broadcasting on any radio or television station without designating, by printing on the envelope or announcement as the case may be, that it is "a Communist organization." A mem-

The purpose of the first sentence of § 4 (f) seems clear in the setting of the Act. In § 2 Congress describes the Communist Party as a group bent on overthrowing the Government by force and violence, such as is described in the Smith Act, and establishing a totalitarian dictatorship in the United States. Section 4 (a) makes it a crime to conspire to that end. Sections 7 and 8 provide for compulsory registration of Communist organizations and members. Penalties for not registering are imposed. If members were required to register under the 1950 Act and if membership were a crime under the 1940 Act, then self-incrimination in violation of the Fifth Amendment might be required by the registration requirements of the 1950 Act. Plainly it was with that problem that Congress dealt in § 4 (f).

The bills introduced in the Eighty-first Congress [2] provided for compulsory registration of members of the Communist Party, but afforded no immunity for registering. When the House Committee reported out its bill,[3] a pro-

ber of a Communist organization which is registered or ordered to register by the Subversive Activities Control Board, who has knowledge or notice of such registration or order, cannot fail to disclose his membership when he is seeking or accepting employment by the United States or at any defense facility. It is also unlawful for such a person to hold employment under the United States, or in any defense facility if he is a member of a Communist-action organization. § 5 (a). Such a person cannot apply for or use a passport. § 6 (a). The Act also modified several existing statutes dealing with subversives and espionage in order to expand their coverage. These extensive criminal provisions belie the thought that Congress regarded the Smith Act as the main gun in the arsenal of antisubversive weapons. The many allusions to the fact that Communists were being more covert in their activities so as to avoid coming within the provisions of the Smith Act make it clear that that Act was not to be of major importance in the campaign against domestic Communists.

[2] S. 2311, 81st Cong., 2d Sess.; H. R. 9490, 81st Cong., 2d Sess.

[3] H. R. 9490, 81st Cong., 2d Sess.; see H. R. Rep. No. 2980, 81st Cong., 2d Sess., p. 8.

vision was included which forbade receipt in evidence of the fact of registration under the Internal Security Act. When the bill reached the floor, Congressman Celler pointed out that the immunity provision was constitutionally insufficient. In the first place, that bill only provided that the fact of registration under the Act should not be received in evidence against the registrant in prosecutions under the Act. Congressman Celler pointed out that there were other criminal statutes, including the Smith Act, for which no immunity was granted.[4] He secondly pointed out that the immunity to be constitutionally protective must be complete; and he discussed *Counselman* v. *Hitchcock,* 142 U. S. 547, in support of that thesis.[5] During these debates and in response to the challenge made by Congressman Celler, the manager of the bill, Congressman Wood, offered an amendment extending the same protection against prosecutions "for any alleged violation of any other criminal statute." [6] It was adopted without discussion and the bill passed the House.

At that juncture it seems obvious that restricting the immunity to use of the fact of registration in any criminal prosecution did not satisfy the constitutional requirements. Such a limited immunity was granted by statute in *Counselman* v. *Hitchcock, supra.* Yet as the Court stated in that case, p. 564:

> "This, of course, protected him against the use of his testimony against him or his property in any prosecution against him or his property, in any criminal proceeding, in a court of the United States. But it had only that effect. It could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his

[4] 96 Cong. Rec. 13739.

[5] *Id.,* 13740.

[6] *Id.,* 13761.

property, in a criminal proceeding in such court. It could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted."

Meanwhile the Senate bill[7] was reported out. The late John W. Davis had stated in a letter to the Senate Committee[8] that compulsory registration might make a member "involuntarily incriminate himself." The Senate bill accordingly provided that neither holding office nor membership in the Communist Party should constitute a violation of certain provisions of the bill; and it also provided that the fact of registration should not be received in evidence against the registrant in prosecutions under those provisions. Senator Kilgore in a minority report[9] made the same point that Congressman Celler had made in the House—that this immunity provision did not even purport to avoid self-incrimination in relation to the membership clause of the Smith Act and did not provide that complete immunity which *Counselman* v. *Hitchcock, supra,* held essential.

Senator Lehman spoke to the same effect when the bill reached the floor: [10]

" 'In support of the statement made by the Senator from Illinois that the real Communists would simply fail to register, and could not be forced to register, and would be outside the control of the law-enforcement officials, is it not a fact that there would be every reason why a real Communist should not regis-

---

[7] S. 4037, 81st Cong., 2d Sess.

[8] S. Rep. No. 1358, 81st Cong., 1st Sess., pp. 43–44.

[9] S. Rep. No. 2369, Pt. 2, 81st Cong., 2d Sess., pp. 12–13.

[10] 96 Cong. Rec. 14421.

ter—because if he did register, would not he make himself liable to incrimination under the Smith Act?'

"Mr. DOUGLAS. 'Certainly.'

"Mr. LEHMAN. 'So he would be virtually pleading guilty of a penal offense; would he not?'

"Mr. DOUGLAS. 'Yes; the real leaders would be.' "

Senator Lehman stated on another day of the debate: [11]

"What dyed-in-the-wool Communist will run to the nearest registration office to list himself as such and expose himself to the penalties contained in the Mundt-Ferguson bill? Obviously, if he did, he would lose all his effectiveness as a Communist, besides subjecting himself to the penalties set forth in this bill. He would also expose himself to the penalties set forth in other laws, such as the Smith Act, under which the 11 top Communist leaders were recently convicted. In fact, registration would constitute self-incrimination, if not under the terms of this law, then under the terms of the Smith Act. Obviously, the Communists would not register."

Senator Humphrey voiced the same objection: [12]

". . . his registration would be equivalent to testimony; and under the interpretation of very prominent attorneys,[13] it could be that he could be prosecuted under the Smith Act."

The answers to these objections were wide of the mark. Senator McCarran said that the registrant was immu-

---

[11] *Id.*, 14190.

[12] *Id.*, 14500.

[13] This reference apparently was to Charles Evans Hughes, Jr. and John W. Davis. *Id.*, 14500. The statement of Mr. Davis is referred to in note 8, *supra*. That of Mr. Hughes can be found in Hearings on H. R. 5852, Senate Committee on the Judiciary, 80th Cong., 2d Sess. 415–420.

nized from prosecutions under § 4 of the bill.[14]   The relevancy of the Smith Act was not recognized.   Senator Ferguson and Senator Mundt likewise did not meet the point.   They noted[15] that membership was held irrelevant to the Smith Act in the prosecution of *Dennis* v. *United States, supra,* overlooking the fact that that case involved not membership but a conspiracy to practice the Communist dogma.

But no change in the bill was made in this respect before it passed the Senate.   The important changes in § 4 (f)—the ones that are critical here—took place in Conferences.[16]   No contemporary statement of the intended sweep of the revised § 4 (f) is in the legislative record.   But I have set out enough history to indicate that the motivation was clearly the fear that the immunity granted under the earlier versions of the bill was not constitutionally sufficient to compel registration, since it

---

[14] "In the opinion of the chairman of the Committee on the Judiciary, this provision leans over backward to protect Communists against self-incrimination; but it is one of the many safeguards written into the bill by the Judiciary Committee to assure the complete constitutionality of the measure." *Id.,* 14175. See also *id.,* 14443.

[15] "Mr. Long. I was under the impression, from hearing the Senator from New York [Sen. Lehman] yesterday, that he said that under a previous statute it was unlawful to belong to an organization that advocated the overthrow of the United States Government by force . . . .

"Mr. Ferguson. Is it not true that Judge Medina, in his charge to the jury in the trial of the 11 Communists, told them that mere membership in the Communist Party was not sufficient to warrant the jury in convicting them under the Smith Act?

"Mr. Mundt. Precisely.

"Mr. Ferguson. So that it could not apply to that law.

"Mr. Mundt. It could not conceivably apply.   Even if the impression which the junior Senator from Louisiana had were correct, it would still be an incorrect interpretation of the act." *Id.,* 14235.

[16] H. R. Conf. Rep. No. 3112, 81st Cong., 2d Sess., p. 49.

did not extend to prosecutions under the membership clause of the Smith Act.

When the bill came back from the Conference Committee Congressman Multer referred to § 4 (f) in its new form and predicted it would "vitiate one of the most important parts of the Smith law." [17]   No reply was made to his comments.   And only brief reference was made to § 4 (f) in the Senate.   Senator Kefauver said,[18] "There is nothing in the bill which provides that when a person registers that fact shall not be used in evidence against him in connection with the Smith Act." [19]   But that statement is irrelevant to our problem because the Senator apparently did not realize that the bill had been amended in Conference to include the words "or any other criminal statute." Senator Kilgore stated that the Conference bill differed from the one approved by the Judiciary Committee over his dissent, since it nullified the Smith Act.[20]   No one challenged the statement.

From this legislative history it seems tolerably clear that one purpose of § 4 (f) was to protect registrants from prosecution under the membership clause of the Smith Act.

The Court holds, however, that the first sentence of § 4 (f) is simply "a mandate to the courts charged with the construction of subsections (a) and (c) 'or . . . any other criminal statute' that neither those two named criminal provisions nor any other shall be *construed* so as to make 'membership . . . per se a violation.' "   If the phraseology were that immunity is extended only to *"membership per se,"* there might be support for the argument that the immunity granted by § 4 (f) extends only

---

[17] 96 Cong. Rec. 15289.

[18] *Id.,* 15198.

[19] *Ibid.*

[20] *Id.,* 15192.

to nominal membership, excluding the type of active membership which we have here. But the statute does not say "membership *per se*." It provides that "[n]either the holding of office nor membership in any Communist organization shall constitute *per se* a violation of subsection (a) or subsection (c) of this section or of any other criminal statute." The kind of membership given immunity is not restricted. It may be nominal, short-term, long-term, dues-paying, non-dues-paying, inactive, or active membership. Every type of membership is included. What the Congress is saying is that no type of membership shall violate alone or by itself (that is to say, *per se*) any criminal statute. When Congress said that membership "shall not constitute *per se*" a violation of any criminal statute, it meant that additional conduct besides membership, whatever its nature, is necessary to constitute a violation. Only by transposing *per se* in § 4 (f) and making it modify "membership" can the Court's argument be made plausible. That entails a substantial revision of the Act and a drastic dilution of rights of immunity which have been granted by it.

If the Court is correct in its view, the constitutionality of registration provisions of the 1950 Act are called into question. True, today's decision in *Communist Party of America* v. *Subversive Activities Control Board, ante,* p. 1, puts off to another day the constitutionality of the registration provisions in their conflict with the Fifth Amendment; I have noted my dissent as to the provision of the registration requirements that designated officials of the Party must complete, sign, and file the Party's registration statement. But if "active membership" remains a crime under the Smith Act, there would be a serious question whether any Communist—active or nominal—could constitutionally be compelled to register under the 1950 Act. For it could be urged that the act of registering

would supply one link that might complete the chain of evidence against him under the Smith Act. It is no answer to that contention that mere membership would not support a conviction. As we said in *Blau* v. *United States,* 340 U. S. 159, 161:

"Whether such admissions by themselves would support a conviction under a criminal statute is immaterial. Answers to the questions asked by the grand jury would have furnished a link in the chain of evidence needed in a prosecution of petitioner for violation of (or conspiracy to violate) the Smith Act. Prior decisions of this Court have clearly established that under such circumstances, the Constitution gives a witness the privilege of remaining silent. The attempt by the courts below to compel petitioner to testify runs counter to the Fifth Amendment as it has been interpreted from the beginning."

This principle had been an established one ever since *Counselman* v. *Hitchcock, supra,* was decided.

The registration provisions of the 1950 Act were the very heart of that law. Disclosure of who the Communists were was the provision from which all other controls stemmed. As the Senate Report stated,[21] the registration requirement is the "central provision" of the Act, the purpose being "(a) to expose the Communist movement and protect the public against innocent and unwitting collaboration with it; (b) to expose, and protect the public against, certain acts which are declared unlawful."

A fair and literal reading of § 4 (f) can save the 1950 Act against this Fifth Amendment objection. By reading § 4 (f) to provide that being a member of the Communist Party shall not "constitute *per se*" a crime, immunity from prosecution under the membership clause of the

---

[21] S. Rep. No. 2369, 81st Cong., 2d Sess., p. 4.

Smith· Act is effected. And that is in full harmony with the purpose to make something more than "membership" necessary for conviction. That something more can be some kind of unlawful activity. After the 1950 Act was passed, membership without other activity was no longer sufficient for Smith Act prosecutions. That seems to me to be the only fair way to read § 4 (f). That conclusion necessarily requires a dismissal of this indictment.